CHEMICAL ENGINEERING
CORPORATION and John
O. McLean, Appellants,

v.

ESSEF INDUSTRIES, INC. and Willard
Stutzman, et al., Appellees.

Appeal Nos. 85–540, 85–1516.

United States Court of Appeals,
Federal Circuit.

July 3, 1986.

David A. Lundy, Lundy and Associates, Fort Wayne, Ind., argued, for appellants. With him on brief, was Robert Luke Walker.

William McCoy, Jr., Pearne, Gordon, Sessions, McCoy, Granger and Tilberry, Cleveland, Ohio, argued, for appellees. With him on brief, was Thomas P. Schiller.

Before MARKEY, Chief Judge, RICH and BALDWIN, Circuit Judges.

MARKEY, Chief Judge.

Chemical Engineering Corporation and John O. McLean (collectively, CE) appeal from orders of the United States District Court for the Northern District of Indiana: (1) granting summary judgment of non-infringement to Essef Industries, Inc., Willard Stutzman, et al. (collectively, Essef); and (2) awarding costs to Essef under Fed. R.Civ.P. 37(c). We affirm.

## Background

CE sued Essef on October 14, 1982, alleging willful infringement of U.S. Patent No. 3,649,532 to McLean (McLean Patent) and unfair competition "by copying well-known patented features of [CE's] method of treating water and by otherwise causing customer confusion."

The McLean patent relates to water treatment for removing natural acidity, soluble and insoluble iron, silt, particulate matter, and sulfur odors from domestic water supplies. Independent claim 1 reads:

1. A process of treating well water for purification thereof to improve palatability, remove iron and reduce aggressiveness due to the acidity of the water, comprising the steps of conducting impure water from a well, introducing and mixing a substantial amount of air in said water, the amount of air being insufficient to substantially precipitate the iron from the water or to raise the pH of the water to an alkaline level, venting excess air from said air and water so mixed while containing the same, *and thereafter gradually raising the pH of the water to 7.0–7.5 while filtering iron hydroxide and other impurities therefrom by passing air and water so mixed while so contained directly through a mineral bed comprised of a mineral capable of raising the pH to 7.0–7.5 and being of* particulate size sufficient to filter iron hydroxide and other solid impurities precipitated therefrom *during said raising of the pH.* [Emphasis added.]

Independent claim 4 reads:

4. A unitary water treating apparatus adapted to remove normal impurities comprising bad taste and odor, iron and aggressiveness due to acidity from well water consisting essentially of a single water tank containing a mineral filter bed in the lower portion thereof, means for conducting water from a well into said tank above and adjacent to said mineral bed, means for mixing air with said water in an amount *insufficient to substantially oxidize and precipitate the iron from the water or to raise the pH of the water to an alkaline level prior to passage thru said mineral bed,* and withdrawal conduit means located in the lower portion of said tank beneath at least a substantial part of said mineral bed for withdrawing water from said tank, said mineral bed being comprised of a mineral *capable of raising the pH of said water as it is passed therethrough to 7.0–7.5 and being of particulate* size sufficient to filter iron hydroxide and other solid impurities precipitated therefrom *during said raising of the pH.* [Emphasis added.]

Dependent claim 5 reads:

5. Apparatus as defined in claim 4, wherein said means for mixing air with said water is a device located in said water conducting means, and said tank is further provided with means for venting excess air and any entrained gases prior to passage of said water thru said mineral bed.

On December 6, 1982, Essef denied infringement and unfair competition and counterclaimed for a declaratory judgment of invalidity, non-infringement, and unfair competition for "filing of the Complaint ... while knowing full well that [Essef has] not manufactured or assisted or induced others in the manufacture of any device which could in any way be construed to be an infringement ..." Essef demanded costs, attorney fees, and treble damages for lost sales because of CE's alleged unfair competition.

On December 15, 1982, CE answered, denying Essef's counterclaim.

## A. Essef's Motion for Summary Judgment

On July 25, 1983, Essef moved for summary judgment of non-infringement, saying its devices (1) "do not raise the pH of the water, which is a requirement of [the McLean patent]," and (2) "have internal processes which are entirely different from those of [the McLean patent]." It also moved to dismiss CE's unfair competition claim.[1]

Essef submitted affidavits of Gerald Matisoff (Associate Professor of Geological Sciences at Case Institute of Technology) and Lowell L. Heinke (a patent attorney), and six exhibits: (1) copy of the McLean patent; (2) sketch attached to Matisoff affidavit; (3) chart of test results attached to Matisoff affidavit; (4) Matisoff's test report; (5) copy of U.S. Patent No. 2,237,882 to Lawlor (Lawlor); and (6) opinion of the Circuit Court, County of Lenawee, State of Michigan, in *Laurene O. Paterson v. Chemical Engineering Corp.*, No. 82–10–1709 (June 10, 1983) (Lenawee opinion), stating that: (1) CE misappropriated trade secrets of Dr. Paterson (inventor-assignor of a water treatment patent to Essef); and, (2) CE's continued manufacture of its device violated that court's temporary restraining order.[2]

### 1. The Matisoff Affidavit and Test Results

Matisoff stated that on June 7 through June 9, 1983, he conducted tests on Essef devices installed in three homes in Northern Ohio to determine whether those devices raised the pH of water. Matisoff took samples of water from five locations: as it came out of the well before the micronizer (a pre-treatment chamber); immediately after the micronizer; before the pressure tank; immediately before the filter tank; and after the filter tank.

The June 7 test was attended by Robert Wilfong and David A. Lundy, President and Counsel respectively for CE. Wilfong and Lundy declined Essef's invitation to attend further tests on June 8 and June 9.

These test results were reported:

At the Isabella residence, the pH of the inflowing ground water dropped from 6.3 to about 6.1 during the tests. At the Long residence, it remained relatively constant at 6.6, and at the Speer residence, it remained relatively constant at 5.9. The water after the filter tank had a pH value less than that of the water flowing into the filter tank. At the Isabella residence, this pH drop was .2 to .3 pH units; at the Long residence it was .1 unit, and at the Speer residence it was .15 unit. 16 parts per million of iron were removed at the Isabella residence, 8 [parts per million] were removed at the Long residence, and 9 [parts per million] were removed at the Speer residence. At all three residences, the ESSEF iron removal system successfully removed iron down to the desired 0.3 parts per million level.

Matisoff also conducted tests to determine whether the filter media might have affected the pH. On completion of those tests, Matisoff reported that the pH at the Isabella and Speer residences remained constant, while pH actually dropped by about .07 units at the Long residence.

Matisoff then summarized his results:

The tests conclusively established that there is no increase in the pH across the mineral or filter bed of the device manufactured by ESSEF Industries, Inc. as installed and operated in a home or similar situation. The tests established a contrary proposition, namely, that there

---

**1.** No issue relating to CE's unfair competition claim is before us.

**2.** The Lenawee opinion contains confidential disclosures of Dr. Paterson's and Essef's trade secrets, and is subject to a protective order entered by the district court. The judgment of the Lenawee court was affirmed on March 8, 1985, by the Michigan Supreme Court. Because the Lenawee opinion and judgment were expressly disregarded by the district court in considering Essef's summary judgment motion, and thus have no bearing on our disposition, they will not be further mentioned.

is a slight decrease in the pH across the mineral or filter bed.

### 2. *The Heinke Affidavit*

Heinke stated that: he had studied the prosecution history of the McLean patent; the Lawlor patent disclosed every significant feature of claim 1 except for "gradually raising the pH of the water to 7.0–7.5 ..."; in his opinion, Lawlor taught every significant feature of claims 4 and 5 except for "said mineral bed comprised of a mineral capable of raising the pH ... to 7.0–7.5; the quoted language formed "critical limitations" in claims 1, 4, and 5; he attended Matisoff's June 8 tests and observed that the Essef device did not raise the pH passing through the mineral bed; and the Essef device did not infringe claims 1, 4, or 5 because it did not raise the pH of the water as it passed through the mineral bed.

### B. *CE's Opposition to Summary Judgment*

On August 24, 1983, CE submitted affidavits of Lundy (trial counsel) and Kinzer (a patent attorney), supplementing those affidavits with portions of the McLean prosecution history, letters between counsel for CE and Essef about Matisoff's tests, and a statement from the Lenawee opinion.

CE said its assertion of infringement, without more, raised genuine and material fact issues inappropriate to summary judgment. In a Memorandum, it argued that: (1) Essef had not proven that its device did not raise pH (i.e., did not literally infringe); and (2) assuming that were proven, Essef had not proven that its device did not infringe under the doctrine of equivalents.

### 1. *Literal Infringement*

CE attacked Matisoff's tests as "clearly ex parte" and thus non-probative:[3]

Plaintiffs were invited only to attend tests conducted by Defendants' expert on units preselected by Defendants, operating under conditions predetermined by Defendants. Plaintiffs requested, but were forbidden, to have any "input" as regards those tests or from doing contemporaneous testing of their own on the same units or from disassembling and examining the units.... Plaintiffs have not had the opportunity to run tests on Defendants' same units. Plaintiffs have not had the opportunity to depose Gerald Matisoff as to the tests he conducted or as to his choice or [sic] iron removers to be tested.

CE also attacked the relevance of Matisoff's tests, saying Essef had not proven that the tested devices were the same as those sold by Essef in the marketplace.[4]

CE further attacked the weight of Matisoff's tests, arguing that they were non-probative because Essef had not provided analyses of factors other than pH and iron, and asserting that those other factors could affect changes in pH.

### 2. *Infringement by Equivalents*

CE said Essef had shown no basis for prosecution history estoppel, and that the McLean patent covered all equivalents permitted by the prior art. CE attacked the sufficiency of the Heinke affidavit, saying its Kinzer affidavit "totally controvert[ed]" Essef's position and raised genuine issues

---

**3.** As the district court correctly noted, CE's assertion that the Matisoff tests were ex parte related to the weight the evidence of the test results should be accorded, not to their relevance or admissability. The district court determined that CE had adequate notice of the tests, and had ample opportunity to observe (if not to participate in) those tests and to respond to Matisoff's affidavit. The correspondence between the parties supports the district court's determination that Matisoff's tests were entirely credible. At 1571.

**4.** Though CE said Essef had not established that the devices tested by Matisoff were the same as the Essef devices contemplated (but never identified as accused devices) in its suit, it never attempted to establish specific facts bringing the identity of the Essef test devices into dispute. Raising a question as to Essef's identification of the test devices is not the same thing as raising a genuine issue of material fact. CE had ample opportunity, had it wished, to obtain a court order permitting it to reexamine the Essef test devices, or to run its own tests on those devices. It decided at its own peril not to do so.

of material fact. Finally, CE said that because the doctrine of equivalents was not precluded, "[p]laintiffs do not have to prove that the Essef units raise the pH of the water treated; Plaintiffs need only prove that the processes and devices are equivalent."

### 3. *Supporting Materials*

The Lundy affidavit attacked the weight of Essef's evidence. Lundy said: he learned of Essef's intention to conduct inter partes tests on March 10, 1983; Lundy and Wilfong attended the June 7 test; he questioned Matisoff; he was told that no analyses other than for iron and pH would be conducted; and "published technical literature" indicated that properties of water affect iron removal, and iron removal may affect pH.

Lundy accompanied his affidavit with copies of letters between the parties respecting Matisoff's tests.

CE's patent law expert, Kinzer, disagreed in an affidavit with Heinke's statement that Lawlor taught every significant feature of the claims, and stated that his examination of the McLean prosecution history indicated that claimed features other than raising the pH were the bases for allowance of the claims. Kinzer also stated that Heinke's opinion on infringement "was rebutted by competent evidence that while the mineral bed of ESSEF does not, in fact, raise the pH of water passing therethrough, the phenomenon during the passage of water, by which the iron is removed, is equivalent to raising the pH for the same purposes."

### C. *Supplemental Filings*

On September 13, 1983 CE filed a Supplemental Reply and an affidavit of its technical expert, Baumann, dated September 9, 1983. The district court placed that reply and affidavit under a protective order: its gist, however, was that Baumann had examined Essef's devices; he believed them to infringe; the devices of the parties performed substantially the same function, in substantially the same way, to achieve substantially the same result; and each element required by the claims could be found in Essef devices.

On December 1, 1983, Essef filed a Supplemental Memorandum, accompanied by pages of a Baumann deposition and a Baumann affidavit dated September 30, 1983, filed in the Lenawee County action. The district court placed that submission under a protective order.

In its Memorandum, Essef pointed to Baumann's deposition testimony in which he acknowledged that Essef's devices, to his surprise, did not raise pH. Essef said CE should be collaterally estopped from asserting equivalents in view of findings supporting the Lenawee judgment. Essef also said the Baumann deposition and affidavit demonstrated absence of any genuine, material fact issue.

### D. *The March 15, 1984 Hearing*

At a hearing on March 15, 1984, the district court repeatedly asked CE's counsel to identify fact disputes precluding grant of summary judgment. CE's counsel answered only that the allegation of infringement, literal and by equivalents, created a fact dispute.[5] CE's counsel commented, correctly, that issuance of a patent on Essef's process was utterly irrelevant to infringement.[6]

---

**5.** The mere allegation of infringement, either literal or by equivalents, does not raise fact issues precluding summary judgment. *See, e.g., Porter v. Farmers Supply Service, Inc.,* 790 F.2d 882, 229 USPQ 814 (Fed.Cir.1986); *Brenner v. United States;* 773 F.2d 306, 227 USPQ 159 (Fed. Cir.1985); *Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255, 225 USPQ 240 (Fed.Cir.1985); *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.,* 743 F.2d 1581, 223 USPQ 277 (Fed.Cir.1984).

**6.** Essef's counsel twice indicated before the district court that the Paterson patent was relevant to the determination on infringement. The district court questioned CE's counsel as to "[w]hat significance do you attach to the fact that Dr. Paterson has obtained a patent?" CE's counsel correctly informed the court that there was none. Nothing in the district court's opinion indicates that its judgment on infringement was in any way impermissibly influenced by the existence of the Paterson patent.

Respecting literal infringement, Essef's counsel said "raising of the pH to 7.0–7.5" was a requirement of the McLean claims, and pointed to tests by Matisoff and Baumann (CE's own expert) showing that Essef's devices did not raise pH.

Respecting infringement by equivalents, Essef argued that application of that doctrine was discretionary, citing *Coleco Industries, Inc. v. United States International Trade Commission*, 573 F.2d 1247, 1258 (CCPA 1978) (Rich, J., and Markey, C.J., concurring), and that nothing of record compelled its application. Essef said CE's position was that Essef's and CE's *devices* operated in the same manner after long use, and cautioned the district court that the comparison must be of Essef's devices with the claims of the McLean patent.

On April 24, 1986, CE filed a Post Hearing Brief in which counsel again identified its mere infringement allegation, literal or by equivalents, as raising a genuine issue of material fact precluding summary judgment. Counsel also pointed to Wilfong's deposition opinion that iron removal could not be effected without somehow raising pH, and that apparatus in the Essef devices might somehow temporarily raise pH.

### E. *Grant of Summary Judgment*

On September 14, 1984, the district court granted Essef's motion for summary judgment, on the ground that Essef had not infringed the McLean patent literally or by equivalents. The court entered judgment that same day.

### F. *Motion for Reconsideration*

CE filed a motion for reconsideration under Fed.R.Civ.P. 52 and 59(e) on September 24, 1984. That motion asserted the existence of 15 genuine fact issues improperly resolved by the court, pointing to numerous statements in depositions and various other documents of record. In denying that motion on September 25, 1984, the district court said:

[P]laintiffs refer to portions of the record not previously cited or identified to this court as relevant to a determination of the summary judgment motion.... The court notes that this motion involved voluminous filings, both legal and evidentiary. This court specifically informed counsel for both parties that the parties must identify those portions of the record which related to the summary judgment motion that presented the critical evidence upon which the parties relied. Plaintiffs apparently did not find the evidence cited in its post judgment motion, not cited in its prejudgment filings as relevant or critical, to be previously relevant or critical. Post judgment motions are not meant to be opportunities to allow parties simply to reargue the same arguments raised prior to the court's ruling.

CE appealed from the summary judgment of non-infringement on October 3, 1984.

### G. *Essef's Motion for Award of Expenses*

On October 29, 1984, Essef moved in the district court under Fed.R.Civ.P. 37(c) for an award of reasonable costs and expenses for CE's failure to admit, when so requested under Fed.R.App.P. 36, that Essef's devices did not raise pH. On December 20, 1984, the district court granted that motion.

In opposition, CE had said Essef's Rule 37(c) motion was duplicative of an earlier motion for attorney fees under 35 U.S.C. § 285, and was for that reason untimely. CE attempted to excuse its refusal to admit, saying to have done so would have been to concede the absence of literal infringement. The district court rejected that excuse, holding that it was *undisputed* that Essef's devices did not raise pH, and that the significance of that undisputed fact was for the court to determine.

CE also said admission that Essef's devices did not raise pH was impossible "because the parameters required in order to answer the requested admission were not identified." The district court also rejected that contention, holding:

[T]here is evidence before this court that plaintiffs were aware that the device manufactured by [Essef] did not raise

the pH of the water being treated. At an evidentiary hearing held several months before the Requests for Admissions were made, one of the plaintiffs testified that he was familiar with the Paterson device and that, to his knowledge, the mineral bed of the accused infringing device did not have the capability to raise the pH to 7.0–7.5 as detailed in the McLean patent. Plaintiffs should have admitted, at least, to the extent of admission already brought forth at the evidentiary hearing, the truth of the matter of the pH. In any event, once both the defendant's and that plaintiffs' experts proved empirically that pH was not raised by the accused device, plaintiffs should have filed supplemental answers to the Requests for Admissions. Plaintiffs refused to admit, at any time and in the face of empirically proven facts, that pH was not raised.

### Issues Presented

(1) Did the district court commit reversible error in granting summary judgment of non-infringement to Essef.

(2) Did the district court have jurisdiction to award expenses under Fed.R.Civ.P. 37(c).

(3) Did the district court abuse its discretion in awarding expenses under Rule 37(c).

### OPINION

### (1) *Summary Judgment*

### (a) *Propriety*

In approaching a motion for summary judgment of infringement or non-infringement, a district court must proceed "with a care proportionate to the likelihood of its being inappropriate." *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573, 225 USPQ 236, 238 (Fed.Cir.1985). Nonetheless, this court has repeatedly upheld a grant of summary judgment in favor of the accused when the patentee failed to establish any genuine issue of material fact and the accused was entitled to a judgment of non-infringement as a matter of law. *See Porter v. Farmers*

*Supply Service, Inc.*, 790 F.2d 882, 229 USPQ 814 (Fed.Cir.1986).

The district court must draw all reasonable inferences in favor of the non-movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, (1962). The movant must carry its burden of establishing the absence of any genuine, material fact issue. Nonetheless, where the movant has also supported its motion with affidavits establishing it is entitled to judgment, Fed.R.Civ.P. 56(e), the non-movant bears a burden of coming forward with specific facts to show that there is a genuine issue for trial. *See, e.g., Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836, 221 USPQ 561, 564 (Fed.Cir.1984). Thus, though summary judgment may be "a 'lethal weapon' ... capable of 'overkill'," *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1116, 227 USPQ 577, 582 (Fed.Cir.1985) (in banc), the threat of summary judgment is often beneficial, forcing movant and non-movant alike to establish what facts, if any, are material *and* disputed. General assertions of fact issues, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden. *Cf. Hodosh v. Block Drug Co., Inc.*, 786 F.2d 1136, 1141, 229 USPQ 182, 186 (Fed.Cir. 1986). Thus, where a non-movant has failed to establish specific fact issues in response to a Rule 56 motion, he cannot later be heard to attack the judgment on the basis of matters that, had he but raised them earlier, might have precluded its grant. *See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d at 836, 221 USPQ at 564.

The record in the case before us establishes CE's failure to come foreward with any specific fact creating an evidentiary conflict. To the contrary, the test results of CE's own expert, Baumann, *corroborated* the results reported in Matisoff's affidavit and established the absence of infringement.

The record further establishes that CE is entirely responsible for creating the problems of which it now complains. Though

repeatedly examined on the basis for its infringement claims, CE never accused a specific Essef device of infringement—even though it had obtained and tested ex parte an Essef device, as revealed by the Baumann deposition testimony.

Questioned at oral argument, counsel was unable to cite a single instance in which CE had identified any particular device accused as an infringement. The filing of a complaint and continuance of judicial proceedings under such circumstances is at best bizarre. CE heavily relied in the district court on disclosures in the Paterson applications and patent, using those disclosures as a short-hand description of Essef's devices. Incredibly, CE now urges reversal because the court also referred to disclosures in the Paterson patent as a short-hand method of describing Essef's devices. We have been shown no error in the district court's occasional references to the Paterson patent. CE's allegations are, at best, assertions of invited error about which CE cannot complain on appeal. *Cf. Weinar v. Rollform Inc.*, 744 F.2d 797, 805, 223 USPQ 369, 373 (Fed.Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985).

### (b) *CE's Position on Appeal*

CE cites various statements of the district court as a basis for asserting that it committed reversible error: (1) in considering the Paterson patent, which CE alleges was not in evidence; (2) in "misusing" the Paterson patent; (3) in comparing claims of the McLean patent to claims of the Paterson patent, rather than comparing the claims of the McLean patent to Essef's devices; (4) in failing to consider the apparatus claims of the McLean patent; (5) in

interpreting the claims of the McLean patent; (6) in resolving genuine issues of material fact respecting equivalents; and (7) in failing to grant its Motion for Reconsideration.

This parade of horribles, duly dressed for inspection, nonetheless reflects a mistaken view of this court's appellate function. We review judgments, not opinions. *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1556, 225 USPQ 26, 31 (Fed.Cir.1985). Though the district court's opinion was not perfect, few human products are. CE has not shown any statement in the opinion to contain other than "errors or defects which do not affect the substantial rights of [CE]." 28 U.S.C. § 2111 (1982); *see Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580, 219 USPQ 8, 12 (Fed.Cir.1983). Surface blemishes do not compel reversal. CE was entitled to a fair hearing, not a perfect one, and it received an eminently fair hearing.

Moreover, we will not here retry the motion. Our appellate review is based on the record—on evidence *actually* presented—not on assorted evidentiary might-have-beens.

Concerning literal infringement, the district court correctly interpreted all process and product claims as requiring the raising of pH[7] and noted, as is undisputed on the record, that the Essef devices before it did not meet that limitation. Concerning infringement under the doctrine of equivalents, the district court correctly noted that the prosecution history of the McLean patent established that raising the pH in the specific manner claimed was crucial to patentability of McLean's invention,[8] render-

---

7. Process claim 1 requires "gradually raising the pH of the water to 7.0–7.5" while filtering "directly through a mineral bed comprised of a mineral capable of raising the pH to 7.0–7.5." Apparatus claims 4 and 5 require a mineral bed "capable of raising the pH ... to 7.0–7.5", and filtering of the water "during said raising of pH."

8. The district court correctly held on the record before it that McLean could not be considered a pioneer patent, because it issued in a crowded art. *See Thomas & Betts Corp. v. Litton Sys-*

*tems, Inc.*, 720 F.2d 1572, 1580, 220 USPQ 1, 6 (Fed.Cir.1983); *see also Hughes Aircraft Co. v. United States*, 717 F.2d at 1362, 219 USPQ at 481.

The Examiner rejected all claims as obvious in view of the Lawlor patent, U.S. Patent No. 2,352,901 to Klein, and U.S. Patent No. 1,997,114 to Martin.

Lawlor and Klein relate to removal of iron by aeration under pressure and filtration. Klein teaches "complete acid removal" from water by mixing a suitable corrective material (such as

ing a device that did not raise pH, as is here undisputed, one that did not function in substantially the same way.

As in any appeal, CE bears the burden of showing error requiring reversal of the district court's judgment. Because CE has failed to establish absence of a proper and sufficient basis for summary judgment, we affirm the grant.[9]

### (2) *Jurisdiction to Grant Essef's Rule 37(c) Motion*

In Appeal No. 85–1516, CE attacks the district court's award under Fed.R.Civ.P. 37(c), saying that the court's entry of judgment deprived it of jurisdiction to award costs to Essef.

CE notes that judgment was entered on September 24, 1984, it filed Notice of Appeal on October 3, 1984, and Essef filed its Rule 37(c) motion on October 29, 1984. On those facts, CE says, the district court "lacked jurisdiction" to consider Essef's motion quoting this from *Popeil Brothers, Inc. v. Schick Electric, Inc.,* 516 F.2d 772, 778, 184 USPQ 244, 248 (7th Cir.1975):

> We conclude that Rule 37(c) expenses and fees must be timely sought prior to judgment and appeal, and that if the

judgment is silent in regard thereto, they are deemed waived or denied.

### (a) *Choice of Applicable Law*

In *Panduit Corp. v. All States Plastic Manufacturing Co.,* 744 F.2d 1564, 223 USPQ 465 (Fed.Cir.1984), this court said "the Federal Circuit shall review procedural matters, that are not unique to patent issues, under the law of the particular regional circuit court where appeals from the district court would normally lie." *Id.* at 1574–75, 223 USPQ at 471–72; *see also Atari, Inc. v. JS & A Group, Inc.,* 747 F.2d 1422, 1438–40, 223 USPQ 1074, 1086–87 (Fed.Cir.1984) (in banc). An award of expenses under Rule 37(c) is procedural, is not unique to patent issues, and does not have a direct bearing on the outcome of patent issues. Thus, the applicable law is that of the Seventh Circuit.

### (b) *Authority in the Seventh Circuit*

In *Popeil Brothers, supra,* the court affirmed a denial of defendant's motion for award of expenses and fees under Rule 37(c). The motion was presented to the district court after the judgment had been

---

marble calcite) with the filter bed material, and that the filter bed performs two functions: it removes most of the oxidized iron and manganese not deposited in the aeration bed and "brings the water to a state of carbonate stability." Col. 5, lines 30–34. It further teaches that "[t]he entire area and depth of the filter bed is effectively utilized and this is realized because the entire bed is able to rid itself of all the suspended oxide of iron, manganese, etc., taken from the water." Col. 5, lines 43–45. Martin teaches "automatically controlling the pH value of water ... by passing the water through a bed of an alkaline substance (such as dolomite) soluble in acid water."

In his Remarks following a November 12, 1971 interview with the Examiner, McLean stated that:

> [N]one of the references show the method of incorporating air in the water to be treated in an amount sufficient to oxidize the iron therein, but in an amount insufficient to raise the pH of the water to alkalinity via stripping out of acidic gases and cause substantial precipitation, and to thereafter pass the water directly thru a mineral filter bed whereby the pH is raised and precipitation and filtering occur therein. . . .

[T]he expression "amount of air being insufficient to substantially oxidize and precipitate the iron from the water or to raise the water to an alkaline level," has been revised by eliminating the words—oxidize and—thereby making it clear that the air entrained is sufficient to oxidize the iron when the pH is later raised by the mineral filter bed.

The prosecution history establishes that Mc-Lean attempted (with success) to traverse the prior art references by limiting the claimed invention to partial oxidation of iron before filtration, but in an amount insufficient to cause substantial precipitation, followed by *raising* pH (with a corresponding increase in the rate of oxidation), and a substantial precipitation of iron in the filter bed. The change from "adjusting the pH" to "raising the pH" underscores the importance of gradual alkalization to the process claimed and the importance of the change in McLean's attempt to distinguish over the prior art.

9. Because we affirm the judgment, we need not discuss at length CE's contentions respecting the denial of its motion for reconsideration under Fed.R.Civ.P. 52 and 59. It is sufficient to note that those contentions have been found without merit.

appealed and the case had been decided and remanded by the court of appeals. On appeal from its denial, the court of appeals, having noted that an award under Rule 37(c) was in "almost absolute discretion" of the trial judge, and having affirmed the denial on the merits, went on to add as further justifying its affirmance in *Popeil* a timeliness factor, saying, as above indicated, that an award under Rule 37(c) must be sought before "judgment and appeal," and, if the judgment is silent with respect thereto, it is deemed waived or denied.

### (c) *Application to the Present Facts*

CE did not present to the district court the jurisdictional argument it now presents to us, nor did it cite *Popeil* for its reference to a Rule 37(c) motion.[10] CE merely argued that Essef's motion was duplicative of its request for attorney fees and went on to contest the Rule 37(c) motion on its merits, saying its failure to admit was reasonable, or that the requested admissions' lack of specificity justified that failure. The district court held on the merits for Essef.

Though sometimes so called, CE incorrectly characterizes Essef's filing of its Rule 37(c) after notice of appeal as "jurisdictional." However, as CE recognizes:

> [T]he general rule divesting the district court of "jurisdiction" upon the filing of a notice of appeal does not refer to the court's jurisdiction under any statute or mandatory rule. "It is a judge-made doctrine, designed to avoid the confusion and waste of time that might flow from putting the same issues before two courts at the same time. It should not be employed to defeat its purposes not to induce needless paper shuffling."

*Terket v. Lund,* 623 F.2d 29, 33 (7th Cir. 1980), quoting 9 J. Moore's Federal Practice ¶ 203.11, p. 3–45 n. 1 (2d ed. 1980).

Nor did the Seventh Circuit in *Popeil* treat the time of filing the Rule 37(c) motion in that case as "jurisdictional." On the contrary, its reference to the trial court's "almost absolute discretion" implies the presence of jurisdiction in the district court.

We do not believe the Seventh Circuit would employ the statement it added on waiver under the facts in *Popeil* to govern the situation presently before this court, where the non-movant failed to assert before the district court that the notice of appeal deprived the court of jurisdiction to act on a Rule 37(c) motion, and failed to allege fundamental unfairness or prejudice —indeed, where the non-movant fully responded to the merits, and only to the merits, of the Rule 37(c) motion before the district court. We believe the Seventh Circuit would reject CE's attempt to label the issue "jurisdictional" as justification for raising it for the first time on appeal.

Moreover, the court in *Popeil* noted the need to bring a Rule 37(c) motion before "judgement and appeal," and was dealing with a Rule 37(c) motion filed after an appeal had been completed and the case had been remanded. In the present case, the motion was filed after the notice of the appeal, but long before even the appellant's brief was due in the court of appeals. As explained by the Seventh Circuit in *Terket,* 623 F.2d at 24, the concern for timeliness arises from the policy against two courts treating the same issues concurrently. That circumstance is neither present nor possible here.

Indeed, no rule specifies the time during which a Rule 37(c) motion must be filed, and, as is explained in the advisory committee note to Rule 37(c), the rule is intended to provide *post-trial* relief. As a practical matter, it will often be necessary to complete a proceeding before it can be said that a requester has "proved" the truth of the matter for which an admission had been requested. We do not believe that the Seventh Circuit would hold, nor would we, that a losing party, by filing a notice of appeal the moment judgment is entered, could thereby divest the district court of all discretion to award appropriate post-trial relief within weeks thereafter, and well

---

**10.** CE cited *Popeil* only in relation to Essef's motion for costs under Fed.R.Civ.P. 54(d).

before the appeal is ready to be heard by the court of appeals.

◼ When, as here, summary judgment was granted and entered on the same day, and the grant of summary judgment and motion under Rule 37(c) are concurrently before only the court of appeals, no basis exists for the view that the Seventh Circuit would hold that the district court lacked jurisdiction to rule on that motion.

### (3) *Discretion*

◼ The district court determined that CE knew Essef's devices did not raise the pH, and that CE should have admitted the truth of that matter. The court noted that the test results of CE's own expert, Baumann, corroborated Matisoff's test results, and held that, if CE's earlier refusal had been otherwise permissible, its failure to file a supplemental answer after Baumann's tests was not. The factual basis for the grant of the motion has not been shown to have been clearly erroneous, *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985), nor has the grant been shown to have been an abuse of the district court's discretion.

◼ The district court properly rejected CE's assertion that for it to have admitted the truth of the matter would have been to concede the absence of literal infringement,[11] noting that "it was a legal issue for this court to determine, on summary judgment, whether the raising of pH ... was a claim of the patent in suit or an element necessary to a claim in the patent in suit." The court also correctly held that "[t]he presence of a legal dispute does not obviate a party's responsibility to admit the truth of a matter which the party knows to be true in order to avoid forcing the other party to prove the truth of the matter." The district court's understanding and application of the law was eminently proper.

As it did before the district court, CE argues that Essef's requests for admission were not sufficiently specific. Saying "water treatment is not an exact science," CE relies on alleged "unpredictability" of Essef's devices, the district court's acknowledgement that an Essef device raised pH (albeit minimally, and far below the claimed range), and the asserted "complexity" of the technology. But CE's excuses for its failure to admit dissipate upon an examination of the requests. They summarize test results achieved by both Matisoff and Baumann, did not require admission of unpredictable events, and were not complex. CE's refusal to admit cannot be justified in fact or law. We therefore hold that the district court did not abuse its discretion in ordering an award of expenses and fees resulting from CE's refusal to admit the truth of the matters set forth in the requests.

AFFIRMED.

BALDWIN, Circuit Judge, concurs in result.

---

11. The notion that CE was free to refuse to admit the truth because the truth might have defeated its lawsuit is contrary to the duty of candor owed the court. *See* Model Rules of Professional Conduct Rule 3.3 (1983); *accord* Model Code of Professional Responsibility DR 7–102(A)(2), DR 7–106(B)(1) (1981).