**GENERAL MILLS, Plaintiff,**

v.

**HUNT–WESSON, INC., Defendant.**

No. 3–95–98.

United States District Court,
D. Minnesota,
Third Division.

Jan. 22, 1996.

Steven B. Poktilow, appeared for and on behalf of Plaintiff.

Robert A. Schroeder, and Craig S. Summers, Los Angeles, CA, appeared for and on behalf of Defendant.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

### INTRODUCTION

Presently before the court are cross-motions for summary judgment. Defendant Hunt–Wesson, Inc. seeks a declaration of non-infringement with respect to U.S. Patent No. 4,267,420 (the '420 patent' or the 'Brastad patent'). Plaintiff General Mills seeks partial summary judgment on the scope of the '420 claims, and asserts that there remain disputed fact issues which preclude summary resolution of the infringement question. For the reasons set forth below, the court denies Plaintiff's motion and grants Defendant's motion for summary judgment of non-infringement.

### FACTS

This dispute focuses on the use of a device called a "susceptor" in the heating of microwave popcorn. General Mills manufactures "Pop Secret", while Hunt–Wesson markets a line of "Orville Redenbacher" products. Both of these products incorporate a susceptor into the microwave bag containing the popcorn. To understand why this fact has become the subject of the parties' heated dispute, it is necessary to review the history of microwave cooking.

Microwave ovens were first marketed in the 1960s. Microwave cooking uses molecular friction to generate heat, whereas conventional methods rely on radiant or conductive heat. Microwaving is well-suited for certain foods, but for others, "according to the time honored custom, it is a matter of necessity from the point of view of taste, of sight, and for general gastronomic appeal to have some browned portion on the outer surface" of the food. U.S. Patent No. 3,783,220 to Tanizaki col. 1, lines 27–30, attached as Exh. 3 to Decl. of James. Microwave ovens, however, cannot provide this.

Since its inception, there have been numerous developments in the art of microwave cooking aimed at solving this problem, one intrinsic to the physics of microwaving. It was found that placement of a thin conductive film on the cooking surface could effect the color and texture changes desirable in certain foods by converting microwave energy to heat. This conversion simulated the results obtained with a frying pan or other conventional methods. In 1958, a patent was issued to Copson for the invention of a dish-like utensil which possessed this quality, and thus caused food "to assume a browned, seared, or crusted condition." U.S. Patent No. 2,330,162 to Copson, col. 1, line 24, attached as Exh. 2 to Decl. Of James. In the 1960's, Raytheon developed a "Microbrowner" dish, comprised of a Pyrex pie dish lined with a chemically-deposited coating of tin oxide. Buffler Aff., para 3. By its nature, the Microbrowner was rigid and inflexible. Id., at para 4. Thus, it was not useful for applications requiring browning or crispening of the entire surface of the food, i.e., not just the bottom. In 1974, a similar patent was issued to Tanizaki. U.S. Patent No. 3,783,-220, attached as Exh. 3 to Decl. of James.

In 1976, Charles Turpin of Pillsbury sought to harness the browning/crispening power of the susceptor in combination with a disposable package for foods such as pizza. U.S. Patent No. 4,190,757, attached as Exh. 4 to James Decl. Pizza, however, only requires browning on the bottom surface. Foods requiring all-around crispening had to await the arrival of the invention which has given rise to this litigation.

*The Brastad Patent*

The Brastad patent comprises a flexible susceptor which achieves the goal of browning and/or crispening the entire surface of the food item. The susceptor is flexible, allowing it to be wrapped around the food, so that the microwave-generated heat which its design makes possible may be imparted to the entire surface. The '420 contains two independent claims which are at issue here:

#### Claim 1

In combination with a food item capable of having its color changed or being cris-

pened by thermal energy, said food item to be heated in a microwave oven,

(a) wrapping material conforming generally to the shape of said food item comprising

(b) a flexible dielectric substrate having a thin semiconducting coating thereon residing in a close proximal relation to a substantial surface portion of said food item,

(c) said thin semiconducting coating having the property of being able to convert a portion of the microwave energy of a microwave oven into heat in the coating itself

(d) to thereby change the color or crispness of the surface of the food item

(e) while permitting the remainder of the said microwave energy to pass through the wrapping material to dielectrically heat the food item.

### Claim 7

In combination with a food item capable of having its color changed or being crispened by thermal energy, said food item to be heated in a microwave oven,

(a) flexible dielectric material having a substantial portion thereof conforming generally to the shape of the food item,

(b) and a relatively thin flexible layer of metal carried by said dielectric material,

(c) said metallic layer also conforming generally to the shape of the food item and residing in a proximal relation thereto and

(d) having the property of being able to convert a proportion of the microwave energy of a microwave oven into heat in the metallic layer itself

(e) to thereby change the color or crispness of the surface of the food item adjacent thereto

(f) while permitting the remainder of the said microwave energy to pass through the flexible dielectric material to dielectrically heat the food item.

## Microwave Popcorn

Microwave popcorn is familiar to most. However, the submissions of the parties have illuminated previously unimagined complexities in this deceptively simple-looking art. Prior to popping, a kernel is essentially a hard, inedible pellet comprised of three main parts: (1) the pericarp, which is the tough, protective outer layer surrounding (2) the endosperm, and (3) the germ. The "floury" portion of the endosperm contains millions of closely arranged cells containing starch and moisture. When heated, some of this moisture is converted into steam, but most of it is "superheated", and remains in liquid form. This superheated moisture is confined by the pericarp, which is subjected to increasing pressure. Eventually, the pericarp ruptures, and explodes in a familiar "pop". The superheated moisture is immediately released and vaporized, causing the starch to quickly gelatinize and expand into the edible, three-dimensional network referred to as "popcorn".

When Hunt–Wesson entered the nascent shelf-stable microwave popcorn market in the early 1980s, it did not incorporate a susceptor into its microwave bag. According to Hunt–Wesson, a drawback associated with its product was the existence of "unpops"—unpopped kernels remaining in the bag. Consumers accordingly felt that they were somehow "cheated". It was recognized that the number of "unpops" could be reduced if the temperature of the bag could be increased more quickly. Susceptors were a known way of accomplishing this, and by the mid–1980s, Hunt–Wesson incorporated one into the "Orville Redenbacher" bag. So had General Mills; this litigation followed.

### DISCUSSION

#### I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir.1992).

In distilling the issues ripe for summary resolution, this court proceeds with caution. *Chemical Engineering v. Essef Industries,* 795 F.2d 1565, 1571 (Fed.Cir.1986). However, the Federal Circuit has repeatedly upheld summary judgments of non-infringement where the patentee has failed to establish a genuine issue of material fact and the movant was entitled to a judgment of non-infringement as a matter of law. *Id.* Where material facts are disputed, all reasonable inferences will be drawn in favor of the non-movant. *Id.* General and conclusory assertions of fact issues will not preclude summary judgment. *Id.*

## II. THE PARTIES' MOTIONS

Initially, the parties dispute the correct scope of the court's task. Hunt–Wesson seeks summary judgment on the ultimate issue of non-infringement. General Mills urges the court to consider only whether popcorn is a "food item" encompassed by the '420 patent, alleging that numerous issues of fact preclude resolution of the central question: has Hunt–Wesson infringed? General Mills' position is not well taken.

## III. INFRINGEMENT ANALYSIS

To establish infringement of the '420 patent, General Mills must demonstrate that each and every limitation set forth in its claims is met either literally or "equivalently" by the Hunt–Wesson product. *Becton Dickinson & Co., v. C.R. Bard, Inc.,* 922 F.2d 792, 796 (Fed.Cir.1990); *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578 (Fed. Cir.1988).

 As both parties recognize, the first step in the infringement analysis is the interpretation of the claims. This task is a question of law for the court. Any doubts regarding this have been conclusively interred [1] by the recent holding of the Federal Circuit in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995):

We therefore settle inconsistencies in our precedent and hold that in a case tried to a jury, the court has the power to construe as a matter of law the meaning of language used in the patent claim. As such, "[a] patent covers the invention or inventions which the court, in construing its provisions, decides it describes and claims" [William C. Robinson, The Law of Patents for Useful Inventions, § 1019, at 247 (1890) ].

Beyond this general precept, the Federal Circuit's analysis of the facts in *Markman* illuminates the flaws in General Mills' argument. At issue in *Markman* was the scope of a patent describing a dry-cleaning inventory-control system. The dispute centered on the proper construction of the term "inventory". The plaintiff's device was capable of tracking various aspects of each dry-cleaning transaction, including a description of the clothing. By contrast, the accused device had no such capability; its functions were confined to tracking *invoices,* i.e., the mere occurrence of each transaction.

The Federal Circuit affirmed the trial court's judgment as a matter of law that the accused device did not infringe. The court held that the construction of the disputed term was a question of law for the court. After construing "inventory" to encompass clothing, the court noted that it was undisputed that the accused device did not have the ability to track clothing. Consequently, the trial court could conclude that the accused product did not infringe. *Markman,* 52 F.3d at 988–989.

General Mills appears to be in a similar position. It seeks to avoid summary resolution of the infringement issue by pointing out that the second step of the infringement analysis, comparison of the properly interpreted claims with the accused device, is normally a question of fact. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed.Cir. 1985). However, "a mere dispute over the meaning of a term does not itself create an

---

**1.** Resurrection is possible, however. On September 27, 1995, after Hunt–Wesson filed its Motion and accompanying Memorandum, the Supreme Court granted certiorari in *Markman.* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995). Until such time as the Supreme Court disturbs *Markman,* the Federal Circuit's teachings must control this court's resolution of these issues.

issue of fact." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed.Cir.1989). Only a "genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation" can create a disputed issue of fact which may not be resolved as a matter of law. *Id.*

General Mills seizes upon specific terms in the disputed claims, suggesting that terms such as "generally" or "proximal" are relative ones which may not be interpreted without reference to a specific product. Thus, General Mills concludes, there is a question of fact.

It is interesting to note that General Mills apparently discerns no such difficulty in presenting the court with facts which it alleges conclusively demonstrate that the '420 patent encompasses popcorn. *See* Pl's Mem.Opp./ Supp.Mot.Summ.J., at 17–20. Moreover, General Mills overlooks the holding in *Mannesmann Demag Corp v. Engineered Metal Products*, 793 F.2d 1279, 1283 (Fed.Cir.1986), where it was noted that the district court construed the terms "closely adjacent" and "in a contacting relation", despite the presence of conflicting interpretations. Although the district court made factual findings as well, there is no suggestion that it considered the *meaning* of the claim anything other than a question of law.

Finally, *Markman* makes clear that the proper construction of a claim can make short work of the question of infringement. General Mills optimistically suggests that disposing of the "popcorn as food item" issue will leave the infringement question untouched. However, it is undisputed that Hunt-Wesson's product involves popcorn. If the '420 does not, then as a matter of law, it has not been infringed.

As set forth below, the court concludes that sufficient undisputed facts exist for the court to decide the ultimate issue of infringement as a matter of law.

**A. Literal Infringement**

■ To ascertain whether the claims "read on" the accused product, the court must first determine the meaning of the '420 claims. This meaning is derived from three sources: the claims themselves, the patent specification, and the prosecution history. *Markman*, 52 F.3d at 979; *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed.Cir. 1991). Reference to these sources establishes that popcorn is not a food item which is encompassed by the '420 patent.

**1. Prosecution History**

The language of Claims 1 and 7, set forth above, did not easily reach the light of day. Rather, the prosecution history discloses Brastad's several amendments in response to repeated rejections by the Patent Examiner. These amendments are instructive here.

On July 6, 1979 the Patent Examiner rejected all fifteen claims of the proposed patent. This action was specifically premised upon both 35 U.S.C. §§ 103 and 112, i.e., that the claimed invention was both "obvious" and "indefinite". The Examiner pointed out that "[d]epending on the type of food placed in the wrapper, there can be a total absence of color change or crispness." Exh. 7 to the Decl. of James, para. 12. The Examiner also stated that the Woods and Tanizaki patents rendered "obvious to one of ordinary skill in the art" Brastad's teaching modifying the food package where browning is a desired result. *Id.*, at para. 14.

In response, Brastad added the following language reflected in the above claims: "In combination with a food item *capable of having its color changed or being crispened by thermal energy*" (emphasis on added language). Brastad argued that this limitation made clear that the claimed invention was operative only in combination with "the proper or appropriate foods", pointing out that "one having ordinary skill in cooking would be able to select those foods that would be suitable for browning and/or crispening." Exh. 9 of Decl. of James, at 31.

Moreover, Brastad carefully distinguished his invention from the prior art. He noted that the Woods patent was primarily concerned with heating the interior portion of a frozen sandwich faster than the bread. Nowhere, he argued, was there a "suggestion that any browning be obtained." *Id.*, at 33. Further, Brastad distinguished Tanizaki by observing that "it is not a flexible situation

where the food may be wrapped for direct heat transfer." *Id.,* at 34. In light of these and other distinctions, Brastad emphasized that his invention was nonobvious because "the applicant achieves browning just where such characteristics or results are desired." *Id.,* at 35. He stated:

> All the applicant wishes to say is that he has given several examples of food where browning or crispening would be desirable, and all that he can further state at this time is that someone familiar with the art would not attempt to brown of [sic] crispen such foods as jellies, fresh fruits, and many foods that normally are not browned by conventional means.
>
> \* \* \* \* \* \*
>
> In other words, the applicant is basing his claim to patentability on the structure set forth and the end result contained in the "whereby" [now, "thereby"] clause *if* the proper or appropriate type of food is contained within that defined structure.

*Id.,* at 30–31.

Brastad's amended application was again rejected by the Examiner on March 4, 1980. The principal basis for the rejection was obviousness in light of Brastad's failure to specify the thickness of the laminate and the type of metal coatings applied. Brastad responded by deleting and modifying some claims, and principally, by changing Claims 1 and 7 to reflect the ability of the coatings to change the color or crispness of the food. The '420 patent was subsequently approved.

This history makes clear that the scope of foods encompassed by the '420 is not unlimited. Rather, it includes only those foods that would be considered *suitable* for browning or crispening. It does not include foods which happen to brown or crispen when subjected to microwaves, where such qualities are neither expected nor desired.

**2. The Specification**

The specification for the patent is consistent with this history and resulting claims language. The specification recites the previous failure of microwaving to "impart the proper amount of browning and/or crispness *to foods normally expected to have such a* quality." U.S. Patent No. 4,267,420 to Brastad, col. 1, lines 25–26, attached as Exh. 1 to Decl. of James (emphasis supplied). General Mills suggests that the specification is "rather quiet as to the particular foods encompassed by the 'food item' referred to in the claims." Pl's Mem., at 15. To the contrary, the specification speaks volumes.

The "preferred embodiment" of the invention, supplied by Brastad, is a fishstick. The accompanying description helpfully informs the reader that fishsticks "exemplify food products having an exterior that should be both browned and crispened in order to enhance the appearance and taste thereof." Exh. 1, col. 3 lines 36–38. This explanation conjures appealing images of hash browns, egg rolls, and the like. Indeed, the specification continues by describing other foods, "such as onion rings and various form of potatoes" for which the '420 is of use. *Id.,* at lines 40–41.

It is true, as General Mills urges, that one need not describe in his specification "every conceivable embodiment of the invention". *United States v. Telectronics,* 857 F.2d 778, 786 (Fed.Cir.1988) *cert. denied,* 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989), citing *SRI Int'l v. Matsushita Electric Corp. of America,* 775 F.2d 1107, 1121 (Fed.Cir.1985). However, the specification as a whole provides an interpretive guide to understanding the meaning of the correct scope of a claim. *Markman.* Absent an indication that a term used in the specification has some special meaning, it is to be given its "ordinary meaning to one of skill in the art". *Intellicall v. Phonometrics, Inc.,* 952 F.2d 1384, 1387 (Fed.Cir.1992); *Markman,* 52 F.3d at 980.

It is likewise unnecessary for the court to enumerate every possible food item to which the '420 speaks. However, giving the terms their "ordinary meaning to one skilled in cooking, it is clear that popcorn is not a food which is browned and/or crispened in a sense remotely akin to that contemplated by the language of the specification. One skilled in cooking would recognize a distinction between the popping of corn and the class of foods exemplified by fishsticks or onion

rings, which are described in the specification.

General Mills has submitted photographs and samples of popcorn taken from various stages of the cooking process. When analyzed by the MacBeth coloring system[2], it is argued, the pericarp becomes objectively "browner" (or more precisely, redder). Thus, General Mills concludes that popcorn browns during cooking.

General Mills also directs the court's attention to the dictionary definition of the word "crisp", meaning "easily crumbled" or "brittle". To explain further this self-evident term, a Stable Micro Systems TA.XT2 Texture Analyzer is employed. The results show that while the pericarp peeled from uncooked popcorn is resilient enough to avoid fracture even when subjected to shearing forces reaching 45$g$, cooked pericarp easily fractures under such conditions. From this, General Mills concludes that popcorn becomes more crisp and brittle during cooking.

This is all very interesting, but it misses the mark. That laboratory analysis reveals that unpopped, *inedible pellets* become brown when heated does not establish a question of fact concerning whether cooked popcorn is normally expected to have a browned exterior. Similarly, that cooked inedible pellets are more brittle than uncooked inedible pellets does not indicate that popcorn is expected to possess a "crispness" akin to that possessed by a fishstick.

The court is not required to receive, let alone credit, the extrinsic evidence proffered by General Mills. *Markman*, 52 F.3d at 980–81. Whether expert testimony on matters technical or obscure is helpful is entrusted to the court's discretion. *Id.* Because the language of the claims, the specification, and the prosecution history are clear, the court concludes that General Mills' expert testimony does not aid the construction of the patent. *Markman*, 52 F.3d at 983.

In sum, the careful, precise claims language submitted to the Patent Examiner, reflected in the prosecution history, is consistent solely with the conclusion that popcorn is not encompassed by the '420 patent. Brastad's limiting amendments and accompanying explanation make clear that only foods normally expected to possess these qualities are included. The "undisputed public record", *Markman*, 52 F.3d at 980, of proceedings before the Examiner provides a clarity fatal to General Mills' case. This record is fairly said to represent the patentee's understanding of what is encompassed by his invention. *Id.* Because the parties obviously do not dispute that Hunt–Wesson's product encompasses popcorn, it follows that the '420 patent has not been infringed as a matter of law.

Although this conclusion mandates judgment in Hunt–Wesson's favor, the language of the claims, in conjunction with the undisputed physical characteristics of the Hunt–Wesson product, also compel this result.

**3. The Claim Language and Undisputed Physical Characteristics of the Hunt–Wesson Bag**

■ The "Orville Redenbacher" bag comprises two rectangular sides dimensioned 11½ ″ x 6″. The sides are folded into three sections: two ends measuring 3½″ X 6″ and the middle, measuring 4½″ X 6″. The 6½ X 5¾″ susceptor is laminated between the bag's inner and outer layers of paper. It resides in one side of the middle section. Prior to cooking, the slurry of popcorn kernels, oil and seasonings form a cake which rests atop the susceptor. Although photographs submitted by General Mills suggest otherwise, the court accepts its contention that approximately 0.9 inches of the susceptor rests atop the cake by virtue of extending slightly into the upward-angled end panels.

■ Because the patentee must demonstrate infringement with respect to each limitation of the claims, each limitation is a material one. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1389 (Fed.Cir.1992). Claim 1 requires a "flexible" "wrapping material" which "conforms generally" to the shape of the food item. General Mills as-

**2.** This is an established means for determining the color of objects. It measures two variables: L*, which represents the darkness of the hue, and a*. The a* value expresses the greenness of an object as a negative value, and its redness as a positive one.

serts that whether the Hunt–Wesson bag meets this description is a question of fact not susceptible of summary resolution. This argument is inconsistent with the ordinary meaning of these terms.

"Wrapper" is a synonym for "wrapping". Unsurprisingly, it means "that in which something is wrapped". Several examples are given, including: a tobacco leaf used for covering cigars; the paper cover of a book; a paper wrapped around a newspaper or magazine, or an article of clothing worn wrapped around the body. Webster's New Collegiate Dictionary (1977 ed.). These examples share an obvious similarity in that what is used for a wrapper "hugs", or envelops the material completely. Moreover, each is essentially formless without the support of the thing wrapped. This common sense reading of the term "wrapper" is, in this context, bolstered by the claim's requirement that the material "conform[ ] generally" to the food item. Each of the examples given above "conforms generally" to whatever is wrapped. Although a wrapper may not be in actual contact with every point of the item, its own shape is defined by the item, whose "shape, qualities or contour" it assumes. *Id.*

At a minimum, these limitations require that the shape of the putative "wrapping material" be dictated by the shape of the item. The physical description of the Hunt–Wesson bag is not in dispute. The photographic evidence submitted by General Mills conclusively establishes that the bag is not formless without the cake contained within. The shape of the bag is not dictated by the popcorn. Indeed, it is the mass of popcorn which is essentially formless; *its* shape is determined by the semi-rigid *bag.* Under General Mills' theory of permissible constructions of "wrapping material", almost anything which contained the food item would qualify, even a cardboard box with a susceptor on the bottom.

This view is further confirmed by the specification, and prosecution history of the '420 patent. In distinguishing the Tanizaki dish, Brastad noted that the prior art .did not

include a flexible susceptor which permitted the food to be "wrapped for direct heat transfer". Exh. 6 to the Decl. of James, at 34. It is clear that the flexibility of the susceptor must contribute to the ability of the device to directly impart heat from the converted microwaves. Therefore, the susceptor, consistent with the claim language, must be in a "close proximal relation" [3] with the surface of the food item. Because a principal aim of the '420 is to provide browning precisely where previous attempts could not, the court interprets the claim as requiring that the entire food surface be subject to direct heat transfer.

Putting to one side the interesting technical question whether it is actually possible .completely to wrap the surfaces of popcorn kernels grouped such as this, it is undisputed that the Hunt–Wesson bag only contains a susceptor on one side of the slurry. Even assuming General Mills' contention regarding the slight overlap of the susceptor, much of the top surface of the slurry is not subject to direct heat transfer from the susceptor. This is not to say that the topmost kernels are not hotter than they would be absent a susceptor. Rather, they are not hotter because of the direct transfer of heat from the susceptor. Any increase in temperature of the top surface at most represents *indirect* transfer as heat is transmitted upwards from kernel to kernel.

Finally, as detailed above, popcorn is not browned and crispened in the sense contemplated by the claim language. Given the court's construction of the claim language, and the uncontested physical characteristics of the Hunt–Wesson bag, there are no material issues of fact precluding summary judgment of literal non-infringement.

**B. Doctrine of Equivalents**

■ Where, as here, a claim does not literally read on an accused device, infringement may yet be found if the accused device performs the same function, to achieve the same result, using essentially the same means as

---

**3.** The word "proximal" means "close". Regardless of whether the term "close proximal" means "really close" or is merely redundant, it clearly encompasses something stronger than "in the neighborhood".

the predicate device. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed.Cir.1989).[4] Although equivalent infringement, like literal infringement is usually a question of fact, the Federal Circuit has repeatedly upheld grants of summary judgment on this very issue where no material issues of fact have been identified. *See, e.g., Johnston*, 885 F.2d at 1581; *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1389 (Fed.Cir.1992); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 797–798 (Fed.Cir.1990).

 To prevail, General Mills must provide evidence which creates a factual dispute whether each and every limitation of the '420, if not met literally, is nonetheless met equivalently. *Johnston*, 885 F.2d at 1581. General Mills has failed to do so. Because popcorn is not a food item which browns or crispens in the sense contemplated by the patent, it follows that Hunt–Wesson's product simply cannot be achieving the same result, viz, browned and/or crispened food. Nor does General Mills raise an issue with respect to the function of the susceptor. Even if the court were to conclude that popcorn browns and crispens in the relevant sense, General Mills has offered no evidence that the Hunt–Wesson susceptor effects this. Rather, as the parties agree, the susceptor causes popcorn to explode better and pop larger. General Mills provides no evidence of a causal link between the use of the susceptor and the color or texture of the cooked popcorn. Such failure is particularly conspicuous in light of its many irrelevant submissions.

For the foregoing reasons, and based on all files, records, and proceedings herein, IT IS HEREBY ORDERED:

1. That the motion of Plaintiff for partial summary judgment is DENIED.

2. That Defendant's motion for summary judgment is GRANTED in its entirety.

**LET JUDGMENT BE ENTERED AC-CORDINGLY.**

**4.** The Federal Circuit has recently stated that other factors may be considered in addition to this so-called "triple identity" test. *Hilton Davis* *Chemical Co. v. Warner–Jenkinson Co., Inc.* 62 F.3d 1512, 1518–1520 (Fed.Cir.1995). However, these factors are not implicated here.