The HOLMES GROUP, INC., Plaintiff,

v.

RPS PRODUCTS, INC., Defendant.

No. CIV.A. 03–40146–FDS.

United States District Court,
D. Massachusetts.

March 21, 2006.

Nicholas J. Nesgos, Posternak, Blankstein & Lund, Gary W. Smith, Posternak, Blankstein & Lund, Jennifer L. Finger, Posternak Blankstein & Lund LLP, Boston, MA, for The Holmes Group, Inc., Plaintiff.

Nisha Koshy Cocchiarella, Fletcher, Tilton & Whipple, PC, Worcester, MA, Thomas R. Fitzsimons, Greer, Burns & Crain, Ltd., Chicago, IL, William D. Jalkut, Fletcher, Tilton & Whipple, Worcester, MA, Paul G. Juettner, Greer, Burns & Crain, Ltd., Chicago, IL, for Defendants.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO STRIKE

SAYLOR, District Judge.

This is a lawsuit for patent infringement, false advertising, and other business torts. The dispute concerns replacement filters manufactured by defendant RPS Products, Inc. that are designed for use in portable air purifiers manufactured by plaintiff The Holmes Group, Inc. The questions presented are (1) whether the replacement filters manufactured by RPS infringe patents held by Holmes; (2) whether the assertion by RPS that its filter "fits" Holmes air purifiers constitutes false advertising and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Mass. Gen. Laws ch. 93A, §§ 2 and 11; and (3) whether the use by RPS of the Holmes mark in connection with the marketing of RPS replacement filters infringes a trademark held by Holmes in violation of 15 U.S.C. § 1114 and Massachusetts common law. Currently pending before the Court are cross-motions for summary judgment and defendant's motion to strike plaintiff's Chapter 93A claim.

## I. Factual Background

### A. The Parties

The Holmes Group is a Massachusetts corporation with its principal place of business in Milford, Massachusetts. Holmes develops and manufacturers consumer and office products, including air purifiers.

RPS Products is an Illinois corporation with a place of business in Hampshire, Illinois. RPS manufactures replacement filters for many makes and models of household air purifiers, including Holmes air purifiers.

### B. Background of the Inventions

In general, portable air purifiers work by utilizing a fan to draw air into the purifier, passing it through a filter to remove unwanted particles, and then blowing the filtered air out. In some designs, the filter is a high efficiency particulate air ("HEPA") filter, which removes virtually all particles of a certain size. To work effectively, the filter must fit properly in the purifier and form a seal that prevents the drawn-in air from bypassing the filter.

After a certain amount of time or usage, the filter will no longer clean the air at an acceptable level and must be replaced.

Holmes contends that the inventions at issue solve a problem concerning the replacement of purifier filters. According to Holmes, ease of filter replacement is an important part of the design of the purifier, because if it is difficult to place the filter in the machine, it is more likely that the filter will not seal properly and the purifier will not function properly. In the past, most purifier filters had frames that required the consumer to squeeze the filters into position in the purifier. These filters relied on clamping friction alone to hold them in place. As a result, they often did not seal properly and were awkward to handle.

According to Holmes, the inventions allow a replacement filter to be placed in a purifier with relative ease. Hanging mechanisms guide the filter into the proper position and eliminate the need for a friction fit. In addition, the inventions use a gasket on the outlet side of the filter, which, together with the use of a plastic frame to hold the filter, aids the formation of the seal.

Holmes also contends that the inventions solve a problem that had existed in the retail market for replacement filters. In the past, retailers generally stocked replacement HEPA filters for every air purifier that they sold. The inventory, however, did not turn over quickly because filters did not have to be frequently replaced. In addition, large-capacity purifiers generally required larger filters, and small-capacity purifiers generally required smaller filters. As a result, retailers had to stock a relatively large number of different-sized replacement filters and devote significant shelf space to the products.

The inventions permit the use of a single size filter in multiple configurations in different-sized purifiers, thus reducing inventory requirements substantially.

## C. *The Holmes Patents*

Holmes holds two relevant patents: U.S. Letter Patent No. 6,425,932 (the '932 patent), entitled "Air Purifier," and U.S. Letter Patent No. 6,685,760 (the '760 patent), entitled "Filter Assembly for Air Purifier."

The '932 patent issued on July 30, 2002. Holmes began shipping air purifiers using the inventions, using the product name "Harmony," in 2002. On February 3, 2004, Holmes obtained the '760 patent, which is a continuation of the '932 patent. Holmes contends that the Harmony machines and filters embody the inventions claimed in these patents.

### 1. *The '932 Patent*

The '932 patent sets forth 24 claims. Holmes contends that RPS has infringed claims 18–20, 22, and 23. Claim 18 is independent of the other claims.[1] It states:

> 18. A filter assembly for removable mounting to an air purifying device, comprising:
>
> a frame;
>
> a filter element mounted to said frame, and
>
> a hanger having a pair of opposed legs configured to form a gap, said hanger being coupled to said frame for removably receiving a hanger support mounted to an air purifying device.

Relevant portions of the '932 patent specification will be presented below as applicable.

---

1. The Court has focused on the independent claims, because if RPS has not infringed those claims, it cannot have infringed the claims that depend on such independent claims.

### 2. *The '760 Patent*

The '760 patent sets forth 26 claims. Holmes contends that RPS has infringed claims 1–12, 14–17, and 19–26. Claims 1, 9, and 19 are independent of the others. Claim 1 states:

1. A filter assembly for removable mounting to an air purifying device having first and second elongate, horizontally extending hanger supports, comprising:

> a frame having a top wall, a bottom wall, and first and second opposing side walls connecting said top and bottom walls;
>
> a filter element mounted within said frame;
>
> a first hanger coupled to said top wall and including a leg extending over said top wall;
>
> a second hanger coupled to said top wall and including a second leg extending over said top wall.

Claim 9 states:

9. A filter assembly for removable mounting to an air purifying device comprising:

> a frame having a top wall, a bottom wall, a first side wall, and a second side wall, said first and second side walls being opposed to each other and connecting said top and bottom walls, said frame defining an inlet end and an outlet end;
>
> a filter element mounted within said frame;
>
> a hanging means coupled to said top wall at said outlet end for removably receiving a first hanger support and a second hanger support; and
>
> means for removably mounting a second filter element to said inlet end of said frame.

Claim 19 states:

19. A filter assembly for removable mounting to an air purifying device having first and second elongate, horizontally extending hanger supports, comprising:

> a frame having a top wall, a bottom wall, and first and second opposing side walls connecting said top and bottom walls;
>
> a filter element mounted within said frame;
>
> a first hanger coupled to said top wall and including a first notch; and
>
> a second hanger coupled to said top wall and including a second notch.

Relevant portions of the '760 patent specification will be presented below as applicable.

### D. *The Competing Replacement Filters*

Holmes makes a number of models of the Harmony purifiers. The largest of these, the HAP–675 and HAP–675RC, use four filters; the HAP–650 uses three; the HAP–625 uses two; and the smallest, the HAP–615, uses one. After Holmes began selling the Harmony line, RPS began to manufacture and sell its own replacement filter, known as the "H600," for use in Holmes purifiers.

### E. *The Design of the RPS Replacement Filters*

RPS manufactured and sold the original design of the H600 filter (the "Original H600 Filter") from March 2002, through November 9, 2004. RPS describes the Original H600 Filter assembly as having two "hangers," each "hanger" having one "leg." It contends that these "hangers" are "coupled to a lip" on the filter frame. As will be explained below, the meaning of these terms, as used in the patent claims, are in dispute.

Holmes disagrees with the way in which RPS describes the features of this filter. Exhibit A to this memorandum is a drawing of the allegedly infringing Original H600 Filter.

RPS permanently discontinued its Original H600 Filter on November 9, 2004.[2] Since December 2003, RPS has manufactured and sold a revised H600 replacement filter (the "Revised H600 Filter") for use in the Harmony models. According to RPS, it changed the design of the H600 filter for two reasons: (1) because Holmes had made a claim for patent infringement, and (2) because the left hanger on the Original H600 Filter was interfering with the door-latching mechanism on the HAP–675 model purifier.

RPS describes its Revised H600 Filter as having one solid plastic device that functions as a "hanger," which device has two "legs" that extend outwardly. This hanging device is attached, according to RPS, to the "lip" of the filter frame. When placed in a purifier, the hanging device engages supports on the purifier, by which the filter hangs. Again, Holmes disagrees with RPS's description of this filter. Exhibit B to this memorandum is a drawing of the allegedly infringing Revised H600 Filter.

### F. Disputes Concerning the Performance of the Filters

The parties dispute whether the Revised H600 Filter can be installed properly in all filter positions in all models of Holmes purifiers. According to RPS, the Original H600 Filter can be used in the place of a Holmes filter in each of the Harmony models, with one exception: when the Original H600 Filter is placed in either of the two left-side positions of the HAP–675 model,

the door to the machine will not latch shut because the door hinges contact the left "hanger" of the Original H600 Filter.

Based on its own observations of the physical samples of the filters and purifiers submitted by the parties, the Court agrees. The Court has also determined that when Original H600 Filters are installed in the HAP–625 (the two-filter machine), the filters will not stay in place if the machine is upright and the door is open. The user must hold the filters in place with one hand while closing the door with the other until the door contacts the filters and holds them in place.

The parties also dispute whether the purifiers perform properly with H600 filters. According to Holmes, Harmony purifiers installed with Holmes filters have been tested and rated by the American National Standards Institute ("ANSI") and the American Home Appliance Manufacturers Association ("AHAM"). These organizations have determined the clean air delivery rate ("CADR") for each purifier in accordance with a standard testing protocol known as AC–1–2002, "American National Standard Method for Measuring Performance of Portable Household Electric Cord–Connected Room Air Cleaners." The CADR is the rate at which certain contaminants—pollen, smoke, and dust—are removed from the air by the purifier as compared to their natural decay rate. The higher the CADR, the cleaner the purified air. The CADR is largely dependent on the performance of the filter in the machine.

An independent agency tested Holmes purifiers, both with Holmes filters and RPS filters installed. The parties do not dispute that these tests showed that RPS

2. Holmes advised RPS of the existence of the '932 patent by letter dated November 27, 2002.

filters produced lower CADRs than Holmes filters.

The parties dispute the import of these lower ratings, including whether buyers in fact rely on CADRs when making purchasing decisions. Holmes contends that consumers will erroneously blame reduced performance of Holmes purifiers installed with RPS filters on the machine itself, and not on the filter.[3]

RPS states that it has never represented that its replacement filters meet the ANSI/AHAM specifications.[4] RPS also maintains that, of more than 16,000 H600 filters sold, it has received only five returns from customers, implying that consumers are not generally dissatisfied with the performance of its filters.

## G. *RPS's Marketing and Advertising of the Filters*

Both the Original and Revised H600 Filters have been marketed and advertised by RPS as replacement filters for Harmony purifiers. Holmes objects to statements made by RPS about its products on three different media: individual cartons, master shipping cartons, and RPS's website.

The H600 filter is packaged in individual boxes for sale in retail stores and through RPS's website. Each individual box contains an "RPS Products BestAir" label, and the following statement: "Fits Holmes® HEPA Air Cleaners Models: HAP 615, 625, 650, 675, 675RC."

RPS ships H600 filters to retailers in a master shipping carton. On each master carton are printed the words "HOLMES HEPA FILTER" and "HOLMES FILTER." Underneath is the defendant's name and location: "R.P.S. Products, Inc., Hampshire, IL 60140." The box does not indicate whether RPS is the manufacturer or a distributor. RPS has also shipped a master carton to at least one individual customer.[5]

RPS maintains a website at *www.rpsproducts.com* where the H600 filter is advertised for sale. One page within the website contains a listing of the air cleaner filters that RPS sells. Printed near the top of that page is the statement,

---

3. In this regard, Holmes submitted the affidavit of Paul Powers, a Senior Vice President/General Manager, who oversees the marketing and manufacturing of Holmes purifiers. Mr. Powers attested that the purpose of the CADRs is to allow consumers and retailers to make objective judgments about the performance of air cleaners. The Holmes filters and their ratings appear on the AHAM website. According to Mr. Powers, the ANSI/AHAM rating is a major marketing feature for the Harmony purifier line. He also testified that, "if an air purifier does not perform well because a replacement filter is not appropriate for the air cleaner, a typical consumer will assume that the entire machine is responsible for the poor performance. A typical consumer would not be able to know whether the poor performance is due to the replacement filter or the machine itself."

4. RPS, in fact, contends that its filters perform *better* than Holmes filters over the course of their lives. RPS has submitted an affidavit from a mechanical engineer who states that the Holmes filters initially outperform the RPS filters, but that over time the RPS filters are more efficient. According to the engineer, the efficiency of the electrostatically charged filter media in the Holmes filter drops as the filter is used or aged due to previously trapped particles on the fibers that block the electrostatic field among the fibers.

5. Richard P. Schuld, President of RPS, stated in his deposition that RPS ships its H600 filters to retailers in the master carton, and that if a customer ordered one or two filters through the RPS website, he did not think that they would be shipped in the master carton. However, Holmes submitted the affidavit of Matthew McGuire, a paralegal working at the office of Holmes's counsel, stating that he ordered an H600 filter from RPS in February 2004, and that it was shipped to his home in a master carton.

"All filters below are BestAir replacement filters manufactured by RPS Products." On the next line is the following disclaimer:

All company names and trademarks herein listed are registered tradenames of their respective companies and are used for identification purposes only. RPS Products is an independent company and is not related to or affiliated with any of these companies. All filters below are manufactured by RPS Products.

The relevant page from the website prints as five sheets of standard paper, although online it is one continuous page. The RPS filters for Holmes products (including the H600) print on the third page. From 2002 to February 2004, the website listed the "H600" filter with the following designation: "Holmes air filter for HEPA models HAP615, 625, 650, 675, 675RC, (HAP–600)." In March 2004, the designation accompanying "H600" was revised to read, "HEPA Air filter fits Holmes model HAP615, 625, 650, 675, 675(RC) (HAP–600)." The disclaimer remained in the same location with the same text.

## H. *The Hamilton Beach Litigation*

RPS asserts that certain statements made by Holmes in connection with another lawsuit in which it was a party are factual admissions that the Court must accept as true. The lawsuit, entitled *Hamilton Beach/Proctor–Silex, Inc. v. Holmes Group, Inc.*, 1:02CV546 (E.D.Va.), involved, among other things, replacement filters manufactured by Holmes for Hamilton Beach's air cleaner. Holmes's packaging for the filters contained the claim, "Also fits Hamilton Beach® True AirTM Plug–MountTM Odor Eliminator." In the course of that proceeding, Holmes submit-

ted the declaration of a manager named Lara Peterson, who attested, among other things, as follows:

(1) Holmes has, for many years, "sold replacement parts, including filters, for its own appliances and appliances made by its competitors."

(2) "When designing consumable products such as filters that are intended to be sold as replacement parts, it is common practice in the industry to design replacement parts that fit devices made by other manufacturers."

(3) "It is common practice for manufacturers to advertise on the packaging for their replacement products that the product can be used in or 'fits' a competitor's device."

(4) "Manufactures of replacement filters routinely advertise on their packaging that their filters 'fit' humidifiers and air purifiers made by competitors. Indicating on the packaging of a replacement filter that the filter can also fit competitors' devices is an accepted and common practice."

(5) "As shown in Exhibit 2, RPS Products of Hampshire, Illinois sells replacement filters for humidifiers under the name BestAir and product nos. H62–C and H64–C, stating on the packages that the replacement filter 'Fits' Holmes®, Hamilton–Beach® and/or Duracraft® Humidifiers." This is "representative of the manner in which replacement parts are packaged by those in the industry."

In addition, RPS highlights a number of statements contained in Holmes's pleadings in that proceeding that are generally unfavorable to the legal position that Holmes has taken in the present suit.[6] According to RPS, these are factual admis-

---

6. For example, in its summary judgment reply brief in that case, Holmes argued that its representation that its replacement filters

"fit" a competitor's odor-eliminating device was not a representation concerning performance: "Holmes has always maintained, and

sions by Holmes that the Court must accept as true, insofar as there is no contrary evidence in the record of this case.

## I. *Procedural History of This Lawsuit*

The original complaint in this case was filed by Holmes on July 3, 2003, and asserted one count of patent infringement against RPS, involving the '932 patent only.

Holmes filed an amended complaint on March 3, 2004. Count I of the amended complaint asserts claims for patent infringement as to the '932 and '760 patents. Count II asserts claims for false advertising, claiming that RPS falsely advertised that its H600 replacement filters "fit" Holmes purifiers. Holmes contends that the statement is false and misleading because, among other things, the H600 filters do not meet Holmes's performance standards and, in some cases, do not physically fit in the machines. Count III asserts claims for trademark infringement based on RPS's listing of its H600 filters as "Holmes air filters" on its website and master shipping cartons.

RPS filed an amended answer on July 29, 2004, in which RPS asserted affirmative defenses of patent invalidity and fair use of the Holmes mark. Both parties filed motions for summary judgment on March 4, 2005. RPS later filed a motion to bar Holmes from raising a claim under Mass. Gen. Laws ch. 93A and to strike all references to the Chapter 93A claim in Holmes's brief. A hearing on the parties' motions was held on July 6, 2005.

## II. *Legal Analysis*

### A. *Standard for Summary Judgment*

In assessing a motion for summary judgment, the court must "pierce the

pleadings and [ ] assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue is one "that a reasonable jury could resolve ... in favor of the non-moving party." *United States v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992). A fact is material "when [it] has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant." *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir.1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir.1995)). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). Where the parties have cross-moved on a particular count, the court must assess each motion separately and determine, for each motion, whether there is no genuine issue as to any material fact and the movant is entitled to judgment. *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n. 4

---

continues to maintain, that the word 'fits' as used in the replacement parts industry does

not imply that a part will or will not meet original manufacturer standards."

(1st Cir.1997); *see generally* 10A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2720 (1998).

For patent infringement claims, it is appropriate to address claims construction in the context of a motion for summary judgment. *See, e.g., Biogen v. Berlex Labs., Inc.,* 113 F.Supp.2d 77, 81 (D.Mass.2000) (conducting a *Markman* hearing "in connection with" the summary judgment hearings), *vacated in part on other grounds,* 318 F.3d 1132 (Fed.Cir. 2003). If the Court's claims construction precludes literal infringement and "the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

### B. *The Patent Infringement Claims*

#### 1. *The Standard*

The assessment of a patent infringement claim is a two-step process. First, the court must construe the meaning and scope of the patent claim. Second, the court must "compare the properly construed claim to the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1247 (Fed.Cir.1998).

"[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). When "the parties do not dispute any relevant facts regarding the accused product but disagree over which of the [proffered possible meanings of the claims is] the proper one,

the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed.Cir.1996); *see also Amgen, Inc. v. Hoechst Marion Roussel, Inc.,* 3 F.Supp.2d 104, 107 (D.Mass.1998) ("[I]f there are no genuine issues of material fact, summary judgment as is appropriate in a patent infringement case as in any other.").

#### 2. *Meaning and Scope of the Patents*

In *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed.Cir.2005), the Federal Circuit clarified the proper approach to claims construction and set forth principles for determining the hierarchy and weight of the definitional sources that give the patent its meaning. These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (citing *Innova Pure Water Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir.2004)).

The claims of a patent "define the invention to which the patentee is entitled the right to exclude." *Phillips,* 415 F.3d at 1312 (citing *Innova,* 381 F.3d at 1115). The words of a claim are to be given their "ordinary and customary meaning" as a person of ordinary skill in the art in question would understand them. *Phillips,* 415 F.3d at 1312–13 (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)). In doing so, the claim should be read "in the context of the entire patent, including the specification." *Phillips,* 415 F.3d at 1313. In some cases, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."

*Id.* at 1314. However, the Court may also look to other sources because terms may have "a particular meaning in a field of art" and patentees "frequently use terms idiosyncratically." *Id.*

■■■ One such source is the claims themselves. Because claim terms are normally used consistently throughout the patent, the meaning of the term in one claim is likely the meaning of that same term in another. *Id.* Further, a term used in another claim may help define the disputed term: for example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314–15.

■■■ The claims must also be read in view of the specification set forth in the patent. *Id.* at 1315.[7] "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (citing *Vitronics*, 90 F.3d at 1582). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316.[8]

### a. *'932 Patent Claims Construction*

■■■ The Court begins by construing the '932 patent. The parties dispute the scope of one of the features of the frame of a filter assembly set forth in Claim 18. That element describes the following feature: "a hanger having a pair of opposed legs configured to form a gap, said hanger being coupled to said frame for removably receiving a hanger support mounted to an air purifying device."

According to Holmes, the indefinite article "a" before each of the terms "hanger," "pair," and "gap" should be construed as meaning "one or more." Therefore, Holmes would have the Court construe the phrase as follows: "*one or more* hanger*[s]* having *one or more* pair*[s]* of opposed legs configured to form *one or more* gap*[s]*, said hanger*[s]* being coupled to said frame for removably receiving *one or more* hanger support*[s]* mounted to an air purifying device." Under this construction, there must be at least one hanger and at least one pair of opposed legs.[9] According to Holmes, however, the ratio of hanger-to-legs need not be 1:2. Thus, Holmes argues, if there is one hanger, the hanger must have two legs; but if there are two hangers, each hanger may have its own pair of legs *or* each hanger may have one leg, with the two legs facing each other. In other words, Holmes contends that a single "pair" of legs could span two hangers.

RPS disputes that the phrase "a hanger having a pair of opposed legs" could in-

---

7. The Patent Act, 35 U.S.C. § 112, requires that the specification "describe the manner and process of making and using" the invention.

8. In the present case, the Court has construed the claims based on the wording of the claims and the specifications, without reference to the prosecution history or any extrinsic evidence. *See generally Phillips*, 415 F.3d at 1317–19.

9. The parties do not advance different meanings of the term "leg" as used in Claim 18. Both parties appear to agree, at a minimum,

that the leg is the part of the hanger that gives the hanger its shape and permits it to engage with a hanger support to hang the filter (similar to the hook portion of a typical clothes hanger). Indeed, a legless hanger would be, at most, no more than a stem (or two stems) that could not achieve the function of hanging the filter assembly from the hanger support. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed.Cir.2005) ("It is ... entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language.").

clude an assembly comprised of two hangers, each with a single leg. RPS argues that the element requires that *each* hanger on a filter assembly have its *own* pair of legs. In other words, RPS contends that there must be a hanger-to-leg ratio of 1:2.

### i. *The Claim Language*

The parties have submitted no evidence that the terms at issue here carry any meaning, even to persons of ordinary skill in the relevant art, other than their ordinary and customary English meanings. Viewed in that light, RPS's proposed interpretation is substantially more plausible, and more in keeping with the commonplace and widely accepted meaning of the words used, than that proposed by Holmes.

First, the ordinary meaning of the phrase "a hanger having a pair of legs" is one hanger having two legs. It is a substantially more strained, if not tortured, reading to interpret the phrase to include two hangers having one leg each.

Second, the claim uses the phrase "a hanger having a *pair* " of legs, not "a hanger having *two* " legs. The term "pair" in this context suggests something more than just "two": a "pair" connotes not just the number of legs, but also the relationship of the constituent parts (the legs) to each other (the pair) and to the whole structure (the hanger). RPS offers the following example to illustrate the issue: one bicycle would commonly be said to have a pair of wheels, but two bicycles, standing side-by-side, would not typically be said to have a "pair" of seats. In this context, the Court agrees.

Finally, the word "pair" would be unnecessary if Holmes's meaning were correct. The phrase "opposed legs configured to form a gap" would suffice to include two hangers, each with one leg, so long as the legs were opposed to one another in such a way as to form a gap between them and to receive a hanger support. That phrase would also include a hanger having two legs, and multiple hangers each having two legs. Under Holmes's interpretation, therefore, the phrase "a pair of" is mere surplusage.

Accordingly, the Court concludes that the claim language on its face describes a filter assembly with a hanger-to-leg ratio of 1:2, where each hanger has two opposed legs. That conclusion is strongly confirmed by other intrinsic evidence, including the specification set forth in the patent.

### ii. *The Specification Language*

The specification discloses only a 1:2 hanger-to-leg ratio. The embodiment set forth in Figure 26 to the '932 patent, which is attached to this memorandum as Exhibit C, is described as a "filter assembly includ[ing] first and second hangers 118, 120. Each hanger 118, 120 preferably includes a pair of legs 119 attached to the top wall 158 . . ."

Plainly, the specification describes the embodiment as having two hangers, each of which has two legs. Further, the specification discloses the function of the legs "configured to form a gap," again, referring to Figures 26 and 29, as follows:

> To complement the configuration of the hangers 118, 120, preferably the elongate hanger supports 122, 124 include at least one rib extending between the gap, and most preferably a pair of ribs 130 that are arranged to contact the *legs* of the hanger 118, 120 when the filter assembly 116 is installed thereon as shown in FIG. 29. The ribs 130 help stiffen the elongate member 122, 124 against bending . . . and reduce the rotation of the filter assembly 116 when the filter assembly 116 is cantilevered—horizontally arranged—as shown in FIGS. 11 and 20.

(emphasis added). The ribs on the hanger support would not "contact the *legs* of the hanger" if there were only one leg. Further, the specification discloses that the hanger support "removably extends within the hanger" and that one embodiment includes "a second hanger having a pair of opposed legs configured to form a gap and a second elongate hanger support that removably extends within the second hanger." If the hanger is not comprised of two opposing sides, a hanger support would probably not be said to extend "within the hanger;" instead it would be said to extend "along the side of the hanger," or "beneath the leg of the hanger." [10]

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw*, 158 F.3d at 1250. The Court concludes that a person of ordinary skill in the art would interpret the phrase "a hanger having a pair of opposed legs configured to form a gap" as describing one or more hangers where each hanger has two legs that are opposed to each other in such a way as to define a gap between them. This is the construction that best comports with the patent as a whole.

### b. '760 Patent Claims Construction

■ The Court next construes the disputed claims of the '760 patent. Each independent claim describes a filter assembly with a frame having a "top wall, a bottom wall, and first and second opposing side walls connecting said top and bottom walls" and a filter element mounted within the frame. The parties do not dispute that the top wall is a part of the frame. The dispute concerns the manner in which a "hanger" or a "hanging means" is attached to the frame. Claim 1 requires "a first hanger coupled to said top wall and including a leg extending over said top wall"; Claim 9 requires "a hanging means coupled to said top wall at said outlet end for removably receiving a first hanger support and a second hanger support"; and Claim 19 requires "a first hanger coupled to said top wall and including a first notch." The issue specifically presented is whether the element providing that a "hanger" or "hanging means" is "coupled to said top wall" includes a "hanger" or "hanging means" that is directly attached to a "lip."

No mention of a "lip" is made in Claims 1, 9, or 19. Rather, the "lip" is a feature described in various dependent claims. Claim 2 depends on Claim 1, and further requires "a *lip* formed on said frame at said frame outlet end, wherein said first hanger and said second hanger are located at said *lip.*" Claim 10 depends on Claim 9 and further requires that "said frame is formed with a *lip* at said outlet end and said hanging means is located at said *lip.*" Claim 16 also depends on Claim 9, and further requires that "said frame is formed with a *lip* at said outlet end, said first and second hangers being located at said *lip.*" Claim 20 is dependent on Claim 19, and further requires "a *lip* formed at said frame outlet end, wherein said first hanger and said second hanger are located at said *lip* " (emphasis added throughout).

The Court must determine whether either of the elements "coupled to said top wall," or the element "coupled to said top wall" and "located at said lip" describes a filter assembly comprised of a frame with a hanger or a "hanging means" attached directly to the lip alone. Because the Court concludes that it does not and because this determination results in sum-

---

**10.** Neither party has claimed that the prosecution history of the '932 patent, or any extrinsic evidence, is relevant to understanding the meaning of the disputed claims.

mary judgment of non-infringement, the Court need not determine whether the "hangers" or "hanging means" described in the independent claims require a 1:1 hanger to hanger support ratio, or explore in further detail the meaning of the term "hanger." [11]

### i. *Claim Language*

The parties do not dispute that the term "top wall" is one of the multiple walls of the frame. Holmes argues that the "lip" is a part of the top wall: specifically, Holmes contends that the "lip" is the raised or projecting edge of the "top wall." RPS argues that the "lip" is a separate feature from the "top wall."

There is nothing in the language of Claims 1, 9, or 19 that suggests an obvious or readily apparent meaning. The term "wall" need not be construed strictly, to mean a two-dimensional or flat surface; a wall may have projections that deviate from its general plane without ceasing to be a wall. At the same time, the word "wall" does not necessarily include such projections.[12] Because the meaning cannot be reasonably inferred from the claim language itself to resolve the dispute, the Court must consider other relevant sources. *See Phillips,* 415 F.3d at 1314.

### ii. *Other Intrinsic Evidence*

The remaining intrinsic evidence provides sufficient guidance to discern the meaning of the disputed phrases.

First, the term "lip" is used in dependent Claims 2, 10, 16, and 20 to limit the filter assembly described in those claims to frames having such lips. Those claims also state that the "hangers" or "hanging means" are "located at said lip." "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314–15. Thus, the Court presumes that the phrase "hanger" or "hanging means" coupled to the "top wall" was not intended by the inventor to mean the same as a "hanger" or "hanging means" "coupled to the lip," or "located at the lip."

Furthermore, the "top wall" and the "lip" are described throughout the specification as different features of the frame having different functions. Not all of the embodiments depict a frame with a "lip." The "lip" is identified as part number 170; this part (for example) is identified in Figures 25 and 29, but not Figures 6, 7, or 8. The embodiments with a "lip" show that the "lip" projects not only from the "top wall," but also from both side walls and the bottom wall. Therefore, the "lip" is something separate from the "top wall." And the "lip" performs a different function than the "top wall." The clear purpose of the "top wall" is, with the other walls, to hold the filter element in place. The specification, however, at Figure 25 describes a frame that "includes a lip 170 that extends around the perimeter of the frame 146 formed with a recess for receiving the [rubber] gasket 174." It further explains that the purpose of the gasket is "to ensure a good seal against the house." Therefore, the purpose of the "lip" is to aid

---

11. In addition, because of the Court's holding, it need not decide whether the "hanging means" referred to in the patent claim is a "means-plus-function" element under 35 U.S.C. § 112.

12. Thus, for example, a painter could reasonably interpret an instruction to paint the din-

ing room "walls" to mean that the task included painting the flat part of the walls and any floor and ceiling moldings or chair rails. But the painter might also reasonably ask whether the moldings and rails should be painted the same color as the "walls."

in forming a good seal by holding a rubber gasket in place. The "top wall" does not perform this function.

Holmes argues that the requirement that the "hanger" or "hanging means" be "coupled to said top wall" and be "located at said lip" would make no sense if the "lip" were not a feature of the "top wall." The Court does not agree. Without deciding the precise meaning of the phrase "at the lip," it clearly means at a minimum that a "hanger" or "hanging means"—already coupled to the "top wall" as a requirement of the independent claim—must also be located very near to, be adjacent to, or actually be on the "lip." *Cf. General Mills v. Hunt–Wesson Inc.*, 917 F.Supp. 663 (D.Minn.1996) ("close proximal relation" means close or very close and not merely "in the neighborhood"), *aff'd* 103 F.3d 978 (Fed.Cir.1997). Embodiments that depict a "lip" uniformly show hangers that are formed both on the "top wall," and on the "lip"; but this does not suggest that the "lip" must be a sub-part of the "top wall."

### iii. *Extrinsic Evidence*

 Holmes argues that the Court should accept extrinsic evidence, in the form of the dictionary definition of "lip" as "a projecting edge," in order to construe the claim language. Extrinsic evidence, however, may be considered only in the context of the intrinsic evidence. "[U]ndue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prose-

cution history,' thereby undermining the public notice function of patents." *Phillips*, 415 F.3d at 1319 (citing *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed.Cir.1995)). Furthermore, the dictionary definition begs the crucial question: is the "lip" the projecting edge of the wall, or is it the projecting edge of the frame?[13] There is nothing in the dictionary to answer this question. It is answered, however, by the specification.

The Court concludes that a person of ordinary skill in the art would interpret the patent as describing an assembly with a hanger or a hanging means that is coupled to the top wall of the frame, *or* to the top wall and the lip, *but not* solely to the lip. This is the construction that best comports with the patent as a whole.[14]

### 3. *Comparison of the Claims as Construed to the Accused Device*

### a. *Literal Infringement*

 To infringe a claim literally, each and every claim limitation must be present in the accused device exactly as claimed, and therefore "any deviation from the claim precludes a finding of literal infringement." *Litton Systems, Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir.1998). Furthermore, "[a]ll limitations in a claim must be considered meaningful." *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed.Cir.1994).

### i. *'932 Claims*

According to RPS, the Original H600 Filter does not literally infringe Claim 18 of the '932 patent because neither hanger has a pair of opposed legs configured to form a gap.[15] For the reasons stated

---

**13.** For example, the lips of a person may be said to project both from the face and from the mouth.

**14.** Because of the Court's holding, it need not construe the meaning of "hanger" or "hang-

ing means" in the context of the '760 patent claims.

**15.** Holmes apparently concedes that the Revised H600 Filter does not infringe the '932 patent.

above, the patent claim requires a 1:2 hanger-to-leg ratio. No reasonable jury could find that the Original H600 Filter literally infringed this claim. Therefore, there is no literal infringement of Claim 18 of the '932 patent or any of the claims dependent on Claim 18. *See CAE Screenplates Inc., v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1316–18 (Fed.Cir.2000).

### ii. '760 Claims

According to RPS, neither the Original H600 Filter nor the Revised H600 Filter infringe Claims 1, 9, or 19 of the '760 patent because the accused device does not contain hangers or a hanging means that are coupled to the "top wall." The Court has examined the accused devices and concludes no reasonable jury could find that the hangers are coupled to the "top wall," which the Court has found to constitute a separate feature of the frame, with a separate purpose, from the "lip." Therefore, there is no literal infringement of Claims 1, 9, or 19 of the '760 patent or of any claims dependent on those claims. *See id.*

### b. *Infringement by Equivalents*

 The question of infringement by equivalents is one of fact. *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1366 (Fed. Cir.1999) (citing *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609–10, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). However, if no reasonable jury could find infringement by equivalents, then summary judgment is appropriate. *Warner–Jenkinson*, 520 U.S. at 39 n. 8, 117 S.Ct. 1040.

As described above, the Court has construed the disputed patent claims as follows: (1) as to the '932 patent, the phrase "a hanger having a pair of opposed legs configured to form a gap" describes an assembly with one or more hangers where each hanger has two legs that are opposed

to each other in such a way as to define a gap; and (2) as to the '760 patent, the phrase "coupled to said top wall" describes a filter assembly with a hanger or a hanging means that is coupled to the "top wall" of the frame, or to both the "top wall" and the "lip," but not solely to the "lip."

 An element is an equivalent if it does the same work in substantially the same way, and accomplishes substantially the same result, even though the elements differ in name, form, or shape. This is sometimes referred to as the "triple identity" test. *Id.* at 35, 39, 117 S.Ct. 1040. Not all claims are entitled to an equal range of equivalents. *Moore U.S.A., Inc. v. Standard Register*, 229 F.3d 1091, 1106 (Fed.Cir.2000). Where the claim language is "inherent[ly] narrow[ ]" the "limitations may warrant little," if any, range of equivalents. *Id.*

 Here, the filter assembly's hanging means is simple, and the language of the claim is quite narrow. The range of equivalents, if any, is therefore very small. The Court need not decide whether a jury could find, under the triple identity test, that the accused devices performed the same work in substantially the same way to accomplish substantially the same result—by, for example, deciding that the hanger coupled to the "lip" substantially meets the element that the hanger be coupled to the "top wall." This is because an element is not an equivalent to a limitation in the claimed invention if such a finding would vitiate an element of the claimed invention. *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed.Cir.2005). "[F]or a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly. If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural

limitations on which the public could rely." *Sage Products, Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1425 (Fed.Cir.1997). Nor may the doctrine of equivalents be used to ignore the actual language of the patent. *K–2 Corp.,* 191 F.3d at 1367.[16]

With respect to the '932 patent, if the Court were to conclude that the Original H600 Filter—which had a 1:1 hanger-to-leg ratio—was the equivalent to "a hanger having a pair of opposed legs configured to form a gap," it would vitiate the element requiring that the hanger have a 1:2 hanger-to-leg ratio. With respect to the '760 patent, if the Court were to conclude that the Original and Revised H600 Filters— which were coupled to the lip—had the equivalent of hangers coupled to the "top wall," it would vitiate the element that the hanger be coupled to the top wall. *See Moore,* 229 F.3d at 1106 (limitation that mailer be comprised of adhesive that extended the "majority of lengths" was not entitled to a scope of equivalents covering a minority of lengths because it would vitiate that limitation and render the previous limitation surplusage); *Athletic Alternatives,* 73 F.3d at 1582–83 (limitation that tennis racket string ends be placed at three distances from the center precluded a finding of equivalence in racket with string ends placed at two distances); *Dolly, Inc. v. Spalding & Evenflo Co., Inc.,* 16 F.3d 394, 400 (Fed.Cir.1994) (summary judgment on claim of infringement by equivalents proper where a "stable rigid frame assembled from the seat and back panels is not the equivalent of a separate stable rigid frame . . . exclusive of seat and back panels").

Accordingly, no reasonable jury could find that the accused products either literally infringe or infringe by equivalents.[17] RPS's motion for summary judgment on Holmes's claim of patent infringement will therefore be granted.

## C. *The False Advertising Claim*

Holmes contends that RPS's claim that the H600 filter "fits" its purifiers is false and misleading because (1) the Original H600 Filter does not physically fit within the HAP–675 machine, because the door cannot close when all four filters are installed; (2) both the Revised and the Original H600 Filters do not fit within the HAP–625 because they do not hang properly in place; and (3) even in circumstances where the H600 filters do physically fit within the purifiers so that air is drawn through them, the purifiers do not meet their ANSI/AHAM-established CADRs.[18] Holmes argues that this violates 15 U.S.C. § 1125 and state law.[19] Both parties have moved for summary judgment on this count.

16. The "all elements" rule does not swallow the doctrine of equivalents: subject matter that is beyond, ignored by, and not included in the literal scope of a claim may contain an equivalent, unless its inclusion is somehow inconsistent with the language of the claim. *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1317 (Fed.Cir. 1998).

17. Because of the Court's ruling, it need not address whether prosecution history estoppel applies or whether Holmes is entitled to summary judgment on RPS's defense of patent invalidity.

18. Holmes's amended complaint also asserted that a high proportion of RPS filters are defectively manufactured, and that this is evidence that the "fit" claim is literally false. In its papers, RPS argued that this allegation is irrelevant; Holmes responded that evidence of defectively manufactured filters was relevant to its claim that the filters do not meet the ANSI/AHAM performance standards. Because of the Court's holding that "fit" does not imply that a replacement filter will meet OEM specifications, it need not consider the (scant) evidence of the sale of defective filters.

19. Holmes contends that the reference to Massachusetts law within the count for false

■ Section 1125(a) prohibits the use of "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of [one person's goods with another person's] goods ..." The elements of a false advertising claim under the statute are as follows:

> (1) a false or misleading description of fact or representation of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false or misleading statement, either by direct diversion of sales from itself to defendant or by a lessening of goodwill associated with its products.

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 33 n. 6 (1st Cir.2000); *accord Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Avenue*, 284 F.3d 302, 310–11 (1st Cir.2002).

### 1. *False or Misleading Statement of Fact*

### a. *Whether Filters Fit Securely in the HAP–675 Purifier and Allow its Door to Close*

■ A jury could clearly find that the advertisement that the filter "fits" a

Holmes purifier necessarily implies a secure fit. A statement is false by necessary implication if, when "considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Clorox Co.*, 228 F.3d at 34–35. A necessarily implied false statement is literally false. *Id.*

There is evidence that the Original H600 Filter does not physically fit in the HAP–675 machine because the door cannot be closed with the left-hand filters in place; that the Revised H600 Filter does not hang securely; and that therefore the statement was literally false or false by implication. *See, e.g., Tripledge Products, Inc. v. Whitney Resources, Ltd.*, 735 F.Supp. 1154, 1164–65 (E.D.N.Y.1990) (statement that wiper blades "fit virtually every U.S. and imported car" literally false where the evidence showed that, at most, the wipers may fit approximately 60% of the cars). There is therefore a genuine issue of material fact as to these aspects of the claim.

### b. *Whether the Filters Fit Securely on the HAP–625*

A jury could also find that the "fit" statement was false by necessary implication with respect to both the Original and Revised H600 Filters as installed in the HAP–625 machine.

Holmes submitted evidence that, when both the Original and Revised H600 Filters were installed in the HAP–625 with

---

advertising in its amended complaint refers to Mass. Gen. Laws ch. 93A and that it is entitled to a declaration that RPS violated this statute. This contention is the subject of a motion to strike filed by RPS, which is discussed below. Other than this wrinkle, neither party contends that the false advertising claim under state law should be treated any

differently than the federal claim. Therefore, the Court will assume that the state analogue prohibiting false advertising (other than, arguably, chapter 93A, discussed below) rises or falls with the federal claim. *See Boston Athletic Ass'n, v. Sullivan*, 867 F.2d 22, 28 n. 4 (1st Cir.1989).

its door open, the filter did not hang properly or securely on the hanger supports. During the Court's examination of the evidence, the Revised H600 Filter would fall out of the upright HAP–625 machine if it was not held in place with one hand until the door of the device was closed enough to contact the filter to hold it in place. A jury could reasonably find that the description that a filter "fits" a purifier necessarily implies that the replacement filter would fit securely, and can be installed normally, without undue effort or dexterity. Accordingly, there is a genuine issue of material fact as to whether the Original and Revised H600 Filters "fit" the HAP–625 unit.

### c. *Whether the Filters Perform to OEM Specifications*

■ Finally, Holmes argues that the use of the word "fit" constitutes a false representation that RPS replacement filters perform to Holmes's original specifications. RPS asserts that it never expressly made such a representation and that use of the term "fit" does not so imply. RPS also notes that Holmes argued to the court in the *Hamilton Beach* litigation that "the word 'fits' as used in the replacement parts industry does not imply that a part will or will not meet original manufacturer standards."

■ The Court agrees with RPS that the term "fit," in this context, cannot mean "perform according to original manufactur-er's specifications." Replacement part manufacturers have a right to advertise that their replacement parts will fit, or are intended for use in, a competitor's device, even if they do not perform in exactly the same way. "Otherwise, the manufacturer of a machine would be granted, in effect, a monopoly on supplying parts to his own machine, for it is unlikely that any competitor would have access to his specifications for the parts." *B.H. Bunn Co. v. AAA Replacement Parts*, 451 F.2d 1254, 1266 (5th Cir.1971). An unduly expansive reading of the term "fit" would thus severely hamper the replacement parts industry.

It is true that the term "fit" implies something more than a simple physical fit, including at least some minimum level of suitability. If the replacement filter literally "fit" into the machine, but did not work at all—for example, if it were made of solid plastic, with no filtering material—a claim for false advertising could be sustained.[20] Here, however, the claim is not that the replacement does not work at all, but that it does not work quite as well as the original manufacturer's products. The term "fit" simply cannot be stretched that far. Therefore, a jury could not find that the term "fit," by itself, is either false or a misleading description of fact insofar as the filters fail to meet OEM standards.

### 2. *Actual Deception*

■ When a statement of fact is false, either literally or by necessary implication,

**20.** Thus, in *In re Emergency Beacon Corporation*, 13 B.R. 773, 774–75 (Bkrtcy.S.D.N.Y. 1981), the complaining company manufactured emergency locator transponders fitted with a battery pack for use in locating downed airplanes in the event of a crash. It claimed that the respondent had engaged in false advertising when it advertised its replacement battery packs as "fit[ting] all Emergency Beacon Corporations ELTs" because the replacement packs, though physically fitting within the device, would fail in the event of a downing at sea or upon impact because the pack was not water- or stress-resistant. *Id.* at 776. The court agreed, finding that the statement implied that the replacement battery pack was a "suitable replacement" for the original. "That the [replacement] battery packet may 'fit' into the [complaining company's] product is a misleading representation because it infers that the [replacement] battery packet also meets the standards required for the original battery packet which it is to replace and that the product will then perform in accordance with its intended design." *Id.* at 778.

a plaintiff need not proffer evidence of consumer deception. *Cashmere & Camel Hair Mfrs.*, 284 F.3d at 311. To the extent the "fit" statement is either literally false (as to the Original H600 Filter and the HAP–675 machine) or false by necessary implication (as to the Revised H600 Filter and the HAP–625 and HAP–675 machines), Holmes need not show evidence of actual confusion.

### 3. *Materiality*

■■■■ A statement is material if it is "likely to influence the purchasing decision." *Id.* (citing *Clorox Co.*, 228 F.3d at 33 n. 6). Where the statement relates to an inherent quality or characteristic of the product, materiality is established. *Cashmere & Camel Hair Mfrs.*, 284 F.3d at 311–12. Here, any statement that replacement filters "fit" Holmes purifiers clearly goes to the inherent qualities or characteristics of the products, and is thus material.

### 4. *Interstate Commerce*

RPS does not contest that the statements at issue were placed in interstate commerce.

### 5. *Injury*

■■■■ The final element is that plaintiff has been or is likely to be injured as a result of the false statement. The injury may be in the form of lost sales to actual or prospective buyers of the product or harm to the goodwill or reputation of the competitor. *Clorox Co.*, 228 F.3d at 33 n. 6; *Cashmere & Camel Hair Mfrs.*, 284 F.3d at 311; *see Beacon Mutual Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 10 (1st Cir.2004) (trademark claim).

Holmes's evidence as to actual or likely injury is slim. Powers testified that a consumer is likely to blame the air purifying device if it does not perform well, even if the filter is to blame, because the consumer is not knowledgeable about how the device works, and that the acts of RPS "will tarnish Holmes's name in the marketplace and adversely affect its goodwill with retailers and consumers." Although far from overwhelming, the foregoing, together with the fact that Holmes and RPS are direct competitors, constitute sufficient evidence to create a genuine issue of material fact as to whether there is a likelihood of harm.

■■■ Holmes has not offered evidence of actual damage to its business. Actual damage is an element of a false advertising claim where the plaintiff is seeking damages. *See Cashmere & Camel Hair Mfrs.*, 284 F.3d at 311. Here, there is no evidence that Holmes lost any actual sales or that its goodwill and reputation actually suffered as a result of any advertising claims made by RPS.

Accordingly, summary judgment in favor of RPS on Holmes's claims for money damages for false advertising will be granted. Summary judgment will be denied, however, as to Holmes's claims for injunctive relief concerning the Original H600 Filter and its "fit" within the HAP–675 purifier, and the Revised H600 Filter and its "fit" within the HAP–625 and the HAP–675 purifiers.

### D. *The Trademark Infringement Claim*

Holmes contends that RPS uses the term "Holmes" in a way that infringes on its trademark in violation of 15 U.S.C. § 1114 and state law.[21] The primary issue

---

**21.** Neither party contends that trademark infringement under state law should be treated any differently than the federal claim. There-

fore, the Court will assume that the state law analogue prohibiting trademark infringement rises or falls with the federal claim. *See Bos-*

is RPS's use of the "Holmes" trademark on its webpage and on its master shipping cartons. RPS has moved for summary judgment on this count.

In general, 15 U.S.C. § 1114 prohibits the use of a trademark in advertising that is "likely to cause confusion, or to cause mistake, or to deceive." There is no dispute that Holmes owns the trademark "Holmes" and has the right to use the mark. *See Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 815–16 (1st Cir.1987). The dispute centers on whether RPS's use of the mark causes a likelihood of confusion among prospective purchasers in the market. The First Circuit has identified eight factors to be weighed in the analysis, as follows:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*Boston Athletic*, 867 F.2d at 29; *Volkswagenwerk*, 814 F.2d at 817.

### 1. *The RPS Webpage*

■ As described above, the RPS webpage lists various replacement air cleaner filters for sale. Until February 2004, it described the "H600" as a "Holmes air filter for HEPA models HAP615, 625, 650, 675, 675RC, (HAP–600)." In March 2004, RPS revised the H600 description to state that "HEPA Air filter fits Holmes model HAP615, 625, 650, 675, 675(RC) (HAP–600)." A disclaimer, present in both versions at the top of the webpage, indicates that RPS is the manufacturer of the listed filters and that it is independent from the

companies whose names and trademarks appear on the page.

As to the website as it existed before February 2004, a jury could find a likelihood of confusion exists in light of the eight *Boston Athletic* factors. There is no dispute that Holmes and RPS sell or target their sales to the same group of prospective retailers and customers, and that both use the Internet to advertise. RPS used the identical mark, "Holmes," on its webpage and packaging. Most significantly, it did not state that its filters "looked like" or were "similar to" Holmes filters but described its filters *as Holmes filters*. Likelihood of confusion may be readily inferred under the circumstances.

■ It is true that there is a disclaimer on the website that, if read by the prospective consumer, would clarify that RPS is the actual manufacture of the filters sold on the website. "In many circumstances a disclaimer can avoid the problem of objectionable infringement by significantly reducing or eliminating consumer confusion by making clear the source of a product." *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315 (2d Cir.1987). However, potentially confusing statements may not be effectively disclaimed where the disclaimer is not in "sufficiently close proximity" to the statements. *Id.* Here, the text of the disclaimer is a considerable distance from the offending description of the H600—approximately three pages away as the webpage prints. It is certainly reasonable to suppose that a typical user of the website might skip over the disclaimer and simply click on the corresponding link to purchase the H600 filter. Therefore, the effect of the disclaimer on the likelihood of confusion is a question for the jury. *See*

ton Athletic, 867 F.2d at 28 n. 4 ("[T]rademark infringement is defined in essentially the same terms under both the Lanham Act and state law.")

*Weight Watchers v. Stouffer Corp.*, 744 F.Supp. 1259 (S.D.N.Y.1990) (likelihood of confusion existed· despite disclaimer on same page as offending advertisement).

As noted, the website was revised in February 2004, so that it now reads "[the RPS] filter fits Holmes [purifiers]." The parties agree that "it is not trademark infringement for a manufacturer of parts to truthfully inform buyers that its parts will fit the trademarked product of another manufacturer." 4 J. THOMAS MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25.51 (2002); *see also Weight Watchers*, 744 F.Supp. 1259.[22]

The question, then, is whether the statement on the revised website is true. As described below, the Court concludes that genuine issues of material fact preclude summary judgment on Holmes's false advertising claim in at least one respect: whether it is true that the Original and Revised H600 Filters "fit" the HAP–625 or the HAP–675 purifiers. Accordingly, the trademark infringement claim based on the revised webpage will also survive summary judgment.[23]

#### 2. *Master Shipping Cartons*

■ As described above, RPS has shipped H600 filters to retailers in master shipping cartons printed with the words "HOLMES HEPA FILTER" and "HOLMES FILTER." The cartons also bear the words "R.P.S. Products, Inc., Hampshire, IL 60140." Holmes has sub-

mitted unrebutted evidence that the master carton is shipped to retailers and to at least one individual consumer.

Summary judgment as to this claim is inappropriate. Based on the language on the carton, a purchaser could be confused as to the actual source of the H600 filter and whether the product is somehow affiliated with or endorsed by Holmes. Furthermore, and unlike the webpage, the carton does not contain a disclaimer, nor does it affirmatively indicate that RPS is the manufacturer. Although H600 filters shipped in master cartons presumably are also packaged in their individual cartons— which do contain a disclaimer and do not designate the H600 as "Holmes Filters"— a jury could find nonetheless that the disclaimer on the individual carton was ineffective to eliminate any confusion that may have arisen from the use of the mark on the master carton. It is of no moment that the master carton reaches the retailer or consumer only after the product has been purchased; it may still confuse the recipient as to the source of the product or whether Holmes is affiliated in any way with RPS. Accordingly, there is a genuine issue of material fact as to whether RPS's use of the language on the master carton constitutes trademark infringement.

#### E. *RPS's Motion to Strike References to Chapter 93A*

■ In its summary judgment brief, Holmes argues that "[s]ince RPS has vio-

---

**22.** As noted, in the *Hamilton Beach* litigation, Holmes asserted that such advertising is an accepted and common practice in the filter replacement industry, and that it advertises in such a way itself. It even cited with approval RPS's advertisement of a replacement filter which "fit" a Holmes machine.

**23.** RPS cites *Knickerbocker Toy Co., Inc. v. Azrak–Hamway Int'l, Inc.*, 668 F.2d 699, 703 (2d Cir.1982), for the proposition that summary judgment is appropriate because any

trademark infringement was *de minimis*. However, *Knickerbocker* involved the appeal of a denial of injunctive relief, as opposed to damages or other remedies, and the infringing activity in that case—the distribution of a catalogue containing the plaintiff's artwork— spanned only four days. Here, the first offending webpage was in place for approximately two years, and the revised webpage appears to be still in place.

lated the Lanham Act, it has also violated [Massachusetts] G.L. c. 93A, § 2 and 11 with respect to advertisement and sale of its products in Massachusetts," and requests that the Court declare that "RPS has violated ... G.L. c. 93A."[24] In response, RPS filed a motion to bar Holmes from raising a "previously [unpleaded] cause of action," and requests that the Court strike those portions of Holmes's motion for summary judgment that refer to Chapter 93A.

The original complaint, filed July 3, 2003, contained one count for patent infringement. In February 2004, Holmes moved for leave to amend its complaint. That motion, which was assented to by RPS, stated that "[t]he Amended Complaint adds a claim under a patent issued to Holmes on February 3, 2004, and a claim for unfair competition under the Lanham Act, Title 15 of the United States Code." The Court granted the request, and Holmes filed its amended complaint on March 3, 2004. The amended complaint contains only three counts: Count I, "Claim for Patent Infringement"; Count II, "Unfair Competition;" and Count III, "Trademark Infringement." There is no specific count alleging a violation of Chapter 93A, and indeed the statute is nowhere mentioned in the document.

RPS argues that it could not be expected to guess, under the circumstances, that Holmes intended to bring an action under

Chapter 93A. It also contends that it would suffer prejudice, in that it would have (1) asserted a number of procedural and substantive defenses that are specific to Chapter 93A claims; (2) sought to avoid penalty damages by tendering a reasonable settlement offer with its answer, *see* Chapter 93A, § 11; and (3) moved for summary judgment on any such claim. In response, Holmes argues that the complaint sufficed to put RPS on notice of such a claim under Fed.R.Civ.P. 8. It points to the allegations of paragraph 29 of the amended complaint, which states (under the heading "Unfair Competition") that RPS's conduct "constitutes unfair competition in violation of 15 U.S.C. § 1125(a), [*sic*] the laws of the Commonwealth of Massachusetts." Because, according to Holmes, Chapter 93A is the most commonly cited Massachusetts statute proscribing unfair competition, the amended complaint provided notice to RPS of the Chapter 93A claim.

The Court strongly disagrees. Under the circumstances, it would be grossly unfair to find that RPS was on notice of a Chapter 93A claim. Whatever the contours of "notice pleading," at a minimum a complaint must provide *some* form of notice of the claims the plaintiff intends to press.[25] Nothing in the amended complaint states, suggests, or even hints that Holmes intended to bring a claim under Chapter 93A. The use of the terms "false

**24.** Chapter 93A prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). For a claim brought by a business plaintiff, § 11 authorizes private suit only where the plaintiff suffers "any loss of money or property, real or personal" as a result. *Id.* at § 11. Business practices are "unfair" if they are "immoral, unethical, oppressive, or unscrupulous" or fall "within the bounds of some statutory, common-law or other established concept of unfairness." *Ellis v. Safety Ins. Co.,* 41 Mass.App.Ct. 630, 640, 672 N.E.2d 979 (1996).

**25.** Holmes argues that it was incumbent upon RPS to move for a more definite statement or to take specific discovery as to the reference to the laws of Massachusetts under its count for unfair competition. That argument turns the concept of "notice pleading" on its head. It was Holmes's responsibility in the first instance to make its intentions known, not RPS's responsibility to ferret them out.

advertising" or "unfair competition" is simply not enough.

The requirement that the plaintiff identify its claims with specificity is particularly important for claims under Chapter 93A. A defendant cannot be expected to guess that a plaintiff intends to bring a claim under the statute, which is unusually open-ended and applies to a wide variety of highly fact-dependent circumstances. *Cf. Halper v. Demeter*, 34 Mass.App.Ct. 299, 610 N.E.2d 332, (1993) (where the pleadings disclosed a specific theory of recovery under Chapter 93A, it would be fundamentally unfair subject defendant to a broader Chapter 93A theory that was not "foretold by the pleadings"). Furthermore, a defendant must be able to consider whether to assert defenses that are specific to Chapter 93A, whether to tender a settlement offer to avoid penalty damages, and the possible effect on the case of the wide array of remedies specifically available under 93A, which are not generally available for most business torts. It would thus be particularly unfair to infer an action under Chapter 93A where none is mentioned in the text.

Accordingly, RPS's motion to bar defendant from raising a claim under Chapter 93A will be granted.

### III. *Conclusion*

For the foregoing reasons:

1. The motion of defendant RPS Products, Inc., for summary judgment is:

 a. GRANTED as to Count I (patent infringement);

 b. GRANTED as to Count II (false advertising) insofar as the claim concerns the failure of RPS's filters to meet Holmes's specifications and insofar as it seeks money damages, and otherwise DENIED; and

 c. DENIED as to Count III (trademark infringement).

2. The motion of plaintiff The Holmes Group, Inc., for summary judgment is:

 a. DENIED as to Count I (patent infringement); and

 b. DENIED as to Count II (false advertising).

3. The motion of defendant RPS Products, Inc., to Bar Plaintiff from Raising an Unpled Cause of Action is GRANTED.

**So Ordered.**